Stephen M. FRANCIS, Plaintiff,

v.

Charles S. OTA et al., Defendants.

Civ. No. 72–3626.

United States District Court,
D. Hawaii.

March 29, 1973.

William L. Kohne, Langa, Kohne, Wetter & Moen, Wailuku, Maui, Hawaii, for plaintiff.

Peter J. Levinson, Deputy Atty. Gen., George Pai, Atty. Gen., State of Hawaii, Honolulu, Hawaii, for defendants.

## DECISION

SAMUEL P. KING, District Judge.

Plaintiff Stephen M. Francis was employed in the University of Hawaii sys-

tem as a counselor at Maui Community College. Defendants are the University, its regents and certain officers. The action was brought pursuant to 42 U.S.C. § 1983,[1] alleging that the circumstances under which Francis was denied tenure amounted to a deprivation of liberty and property without due process of law under the Fourteenth Amendment.

Francis was first employed by the University on August 1, 1968, for a one-year probationary term. This was followed by a second one-year term, and then by a final probationary term of two years, after which, in the normal course of events, he would be eligible for tenure.

Actual grant of tenure, under the policy in effect, was preceded by a "letter of intent" to confer tenured status. This was sent at the conclusion of the third probationary year, and provided the employee with a form of de facto tenure during his fourth year. For those who were denied such a letter, the fourth year was terminal. Francis did not receive a letter, and his employment with the college ended at the conclusion of the 1971–1972 academic year.

At the time Francis began his employment with the College, there was no full-time registrar. Francis was asked to assume the responsibilities of that office, in addition to his regular duties as a counselor. He did so, and by May, 1971, a large part of his time was devoted to his function as registrar.

On May 12, 1971, a preliminary audit of the registrar's office was conducted. It appeared to reveal serious shortcomings in the manner used to process some applications for admission. There were indications that a large number of out-of-state students were admitted without being required to pay mandatory additional fees.

On the following day, the acting provost for the College prepared a "memo for the record" which he titled "Deficiencies in Registration Procedures as Supervised by Steve Francis". This of-

ficial, defendant Luntey, recommended that Francis be relieved of his duties as registrar. On May 14, Luntey received a memo from the College's acting dean of instruction concerning Francis. The memo discussed his performance as registrar, along with the audit, and declared that "[a]n obvious lack of follow through and bad decisions that may cost the State thousands of dollars, were uncovered. . . . I strongly recommend that probation be extended so as to provide the College another year to evaluate his work."

Shortly thereafter, Luntey sent his tenure recommendation for Francis to defendant Melendy, vice-president of the University for community colleges. In it he discussed the audit and Francis' performance as registrar, noting "at least a strong possibility that he has not performed in this job satisfactorily." Luntey then requested that Francis' probation be extended for an additional year "to determine whether or not [he] should be tenured as a Counselor."

Francis was relieved of all duties as registrar on May 28, and was reassigned as a full time counselor. Soon after, Melendy wrote to Luntey with regard to whether Francis should receive a salary increment. His memo pointed out that the provost would be required to indicate whether Francis' services were satisfactory. Melendy concluded that they were not, and he referred to "serious delinquency" on the part of Francis.

On June 1, Luntey notified Francis that he had requested a one-year extension of probation (and thus a withholding of a letter of intent), based upon the audit and the recommendation from the dean. Luntey explained that the audit "came at almost the exact day on which we were to submit to the Vice President recommendations for or against tenure for third year faculty." The alleged irregularity, he continued, "was of such a magnitude" as to justify the extension. Melendy had actually transmitted to defendant Cleveland, president of the Uni-

---

1. The University did not raise any question as to its possible immunity from suit under § 1983.

versity, a negative recommendation on tenure for Francis on May 13. On June 3, he notified Luntey that an extension of probation could not be considered because of opposition to that procedure from the American Association of University Professors. He was therefore recommending to the president that Francis not be given a letter of intent. This meant, he explained, that 1971–1972 would be Francis' terminal year.

Notice of termination was relayed to Francis on June 14. It was explained that the decision "has been prompted by events that occurred during your tenure as registrar at Maui Community College."

On September 2, 1971, a memo from Cleveland was widely circulated on all campuses of the University system. Among the matters it discussed was the enrollment of out-of-state students. In this regard, Cleveland declared that "the only case where there seems to have a deliberate suspension of the rules has been at Maui Community College; the much smaller delinquencies at other Community Colleges are the consequence of inattention which we believe is now being corrected. The Maui situation is now being cleaned up, as best as can be, on the basis of the ruling by the State Comptroller; we are awaiting a further ruling on the legal aspects by the Attorney General."

The Supreme Court of the United States had occasion to consider the dismissal of a non-tenured state college faculty member in the recent case of Board of Regents v. Roth, 408 U.S. 564, 92 S. Ct. 2701, 33 L.Ed.2d 548 (1972). Although it held that the teacher involved had not shown a deprivation of either liberty or property under the Fourteenth Amendment, the Court examined the application of both concepts in the academic setting. Quoting from its holding in Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), the Court emphasized that the liberty guaranteed "denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men."

The Court continued, with reference to the college instructor before it: "The State, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality. Had it done so, this would be a different case. For '[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.' " Citations omitted.

■ In the Roth case, the Supreme Court emphasized the lack of support in the record before it for the claim that Roth had been damaged in any way beyond simply not being rehired. In this case, the record is quite different. Documents in evidence, including the official notification to Francis, confirm that the decision to deny him tenure was made in haste and was based on the allegations of his misconduct. The charges of official misconduct, with the implication that they might be serious enough to warrant legal action, were circulated throughout the academic community of the state by the University's highest executive officer. Under such circumstances, the assertion by the defense that his dismissal would not preclude Francis from seeking employment elsewhere in the University system, is unrealistic.

Francis testified that he had in fact sought employment, not only in the University of Hawaii system, but on the mainland as well. He met with no success. It is not necessary for this court

to attempt a determination of what effect the circumstances of his dismissal might have had on Francis' search for work. Francis was denied tenure and terminated from the University under charges that he had been seriously delinquent and had deliberately suspended University rules, with a resultant heavy financial loss to his employer. In the profession Francis has chosen, these accusations would call his reputation into the gravest doubt. There is no question under our law that "where the State attaches 'a badge of infamy' to the citizen, due process comes into play." Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971). Evidence in this case indicates that the decision to deny tenure to Francis, and to terminate his employment with the College, was made as early as the day after the audit which first raised questions about his performance. There was no notice of the charges to Francis, and no hearing was held before the decision was made. I hold that Francis was denied his liberty without due process of law.

Defendants contend that this case falls within the scope of Moore v. Knowles, 466 F.2d 531 (5th Cir. 1972). In *Moore* an eighth-grade teacher who had been employed by the same school district for sixteen years was suspended after students accused him of sexual misconduct. He was subsequently indicted by a grand jury on four criminal charges. The district court found that under the circumstances of his suspension, the procedure followed did afford "the rudiments of fair play" to the teacher. It further decided, however, that he had an "expectancy" of further employment, and that he had "not been afforded minimum due process regarding the termination of his contract".

The Fifth Circuit reversed on the narrow ground that a mere expectancy of employment is not sufficient to require a hearing, citing Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). The issue was thus decided solely on the basis of the property inter-est which the teacher claimed in his employment, and no consideration was given to whether he had been denied liberty without due process of law. The *Moore* case is therefore not authority on that question.

■ Even if this were a case to be decided only on the property interest, *Moore* would not be controlling. The Court there specifically found that "[t]he suspension did not violate the school system's own procedures." I find that in denying Francis a letter of intent to grant tenure, Maui Community College did violate its own established procedures.

Defendant Melendy testified that in mid-May, 1971, he recommended a denial of tenure to the president of the University based upon "reasonable doubt." The reason for this "reasonable doubt," he explained, was the absence of any material in Francis' personnel file at the college upon which to base an evaluation for tenure. The court in this case has had some difficulty in unraveling the Byzantine personnel practices of the college. However, it seems reasonably clear that this absence of evaluative material would have presented no serious obstacle had the decision to deny tenure not already been made. In any event, it was the responsibility of the college, and not of the individual faculty member, to secure the necessary evaluations.

Defendants argue that no regular evaluation procedures had been adopted by the college at the time in question. Presumably it would therefore follow that broad discretion rested in the hands of the officials. I find to the contrary. There were a set of procedures in existence. Melendy testified that there was "no evidence" that they had been formally approved. He dismissed as "folklore" the belief of both faculty and administrators at the college that these were the procedures which governed Francis' case. Yet in his own written review of the case, he referred to the "Maui procedures, approved by Provost Hoshor," in a fashion which indicates

his acceptance of them as authoritative. Rather than contending that the procedures were not valid, had not been adopted, or were otherwise defective, Melendy simply avoided them with the assertion that there was no violation, because the tenure decision on Francis was not negative at all. It was, he contended, merely a postponement of the whole matter.

The defense was apparently unwilling to pursue this logic seriously, with good reason. I will merely note that the University administration did not call the regulations into question at any point in the extended consideration the matter was given before this hearing. I am satisfied that the procedures were in effect.

Briefly, the procedures provide for evaluation, through personal interviews and other means, by the faculty member's department or division chairman. Criteria for the evaluation are indicated. This is to be followed by a written analysis, including suggestions for improvement. The chairman then makes a written recommendation to the provost, through the dean, with a copy delivered "simultaneously" to the concerned employee. The dean may make his own recommendation. If either is negative the employee must be notified in writing at least three weeks before the deadline for the letter of intent. At the same time, notice is sent to the privilege and tenure committee of the faculty senate. This body may then review the matter, at the employee's request, and submit its own recommendation. All final recommendations must be in the provost's office a week before the deadline, and the provost must provide written notice of his decision. He must then invite the employee to discuss a negative decision before it is sent to the Regents.

■ These procedures were not followed in arriving at the decision to deny tenure to Francis. Consideration at the college level, such as there was, took place almost entirely after the final decision was transmitted to the president by Melendy. Subsequent review at the college, which indicated that the audit was in error, and was largely favorable to Francis, was ineffective for the purpose of satisfying these requirements.

■■ In the developing area of the law dealing with academic due process, it is clear that a non-tenured faculty member must have more than a subjective expectation of future employment in order to assert a property interest protected by the Fourteenth Amendment. Board of Regents v. Roth, *supra.* However, even where a contract obligation might not otherwise exist, the college can create one if it adopts regulations or standards which lead to the expectation of reemployment. Greene v. Howard University, 134 U.S.App.D.C. 81, 412 F. 2d 1128 (1969); Ferguson v. Thomas, 430 F.2d 852 (5th Cir. 1970). The Supreme Court amplified this principle in *Roth, supra:* "Property interests . . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." 408 U.S. 577, 92 S.Ct. 2709. In Perry v. Sindermann, *supra,* decided the same day as *Roth,* the Court quoted with approval from Corbin on Contracts to the effect that "[e]xplicit contractual provisions may be supplemented by other agreements implied from 'the promisor's words and conduct in the light of the surrounding circumstances.'" It held that the teacher "must be given an opportunity to prove the legitimacy of his claim of such entitlement [to continued employment] in light of 'the policies and practices of the institution.'"

In the case before us, I find that Francis had a legitimate expectation of future employment unless and until the administration of the University deprived him of that expectation in a manner consistent with the established procedures in effect at Maui Community College. This expectation was sufficient

to create a property interest protected by the Fourteenth Amendment. Since there was neither notice nor hearing before the decision, that interest was denied to Francis without due process of law.

I therefore conclude that Francis should be restored to his position on the faculty of Maui Community College, with back pay from the date of his separation from the college, and that he should be evaluated for tenure in accordance with criteria and procedures established for this purpose at the college.

Appropriate orders consistent herewith will be entered upon presentation.

The foregoing shall constitute the findings of fact and conclusions of law required by Rule 52 F.R.Civ.P.