JOAN ABRAMSON, Plaintiff-Appellant, Cross Appellee *v.* BOARD OF REGENTS, UNIVERSITY OF HAWAII, et al., Defendants-Appellees, Cross Appellants

NO. 5729

APRIL 2, 1976

RICHARDSON, C.J., KOBAYASHI, OGATA, MENOR and KIDWELL, JJ.

OPINION OF THE COURT BY KIDWELL, J.

Plaintiff sought in this action to establish or enforce a claim to academic tenure as a member of the faculty of the University of Hawaii. The trial court determined that tenure had not been acquired but directed the Board of Regents to consider Plaintiff's case. Upon compliance by the Board, the complaint was dismissed. Costs were awarded to Plaintiff. Both Plaintiff and Defendants appeal. On Plaintiff's appeal, we affirm. On Defendants' appeal, we reverse the award of costs to Plaintiff.

We deal in this case with an important aspect of the relationship between the University and its faculty. Plaintiff seeks the status of academic tenure, defined as "the right to permanent or continuous service in the University which may be terminated only for adequate cause, retirement, or demonstrably *bona fide* financial exigencies." Faculty Handbook, University of Hawaii (1969 Revision), Appendix A, Sec. 1(a).[1] She contends that the University administration, while expressing an unwillingness to grant tenure, failed to follow prescribed procedures with the result that

---

[1] In 1972, tenure plans were in effect in all public and private universities and public four-year colleges, as well as 94 percent of the private colleges in the United States, though with great variation in policies and practices. COMMISSION ON ACADEMIC TENURE IN HIGHER EDUCATION, FACULTY TENURE, *A Report and Recommendations by the Commission on Academic Tenure in Higher Education,* 2, 3 (1973). The policy upon which tenure is premised has been stated:

Academic freedom requires that a professor should receive effective protection of his economic security through a tenure system which should provide at least these safeguards:

1. A probationary period of stated length, the maximum conforming to a national standard.

2. A commitment by an institution of higher education to make a decision in advance of the end of the probationary period whether a permanent relationship will be entered into; collaterally, national standards of notice for such decisions.

3. Appointment to a tenure post if a person is continued beyond the limit of the probationary period.

4. Termination of a tenure appointment only because of age under an established retirement system, financial exigency, or adequate cause.

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, ACADEMIC FREEDOM AND TENURE, p. 5 (1967).

plaintiff received tenure pursuant to her employment contract. She also asserts denial of procedural due process and of rights under the Hawaii Administrative Procedure Act. It is necessary to set forth the factual context of the dispute at some length in order to disclose the issues.

Plaintiff was appointed as a full-time instructor in the English Department of the University, in a CI2 rank, for the academic years 1967-68, 1968-69, 1969-70 and 1970-71. Her only graduate degree was an M.S. degree in journalism. During the fall of 1970, she applied for tenure pursuant to the provisions of Appendix A of the Faculty Handbook (of which the relevant provisions are quoted below),[2] which the parties have agreed contain the rules which govern the grant or denial of tenure by the University. The Chairman of the English Department recommended against tenure, stating that while Plaintiff's "achievements and qualities are admirable, I can see no place for her in our department." The Dean of the College of Arts and Sciences (within which the English Department was situated) transmitted this recommendation with his concurrence and that of the Personnel Committee of the College. The Faculty Personnel Committee then recommended that tenure be granted on the basis of "demonstrated excellence in lower division teaching" and disagreement that

---

[2] Appendix A — Academic Tenure, Policy and Procedures

*TENURE AND SERVICE*. The University of Hawaii subscribes to the A.A.U.P.'s 1940 Statement of Principles of Academic Freedom and Tenure, with such clarification of specific points as may be included in this part.

Section 1. *Definitions*. As used in this part, the term:

(a) "Academic tenure" means the right to permanent or continuous service in the University which may be terminated only for adequate cause, retirement, or demonstrably *bona fide* financial exigencies.

(b) "Adequate cause" means a reason or reasons which may be used to initiate suspension or dismissal procedures outlined in Appendix C.

(c) "Probationary period" means a period of assessment which begins after appointment to a full-time position in ranks 2, 3, 4 and 5 at the University of Hawaii and ends after continuous service at the University by the granting of tenure or the refusal of tenure by the Board of Regents. During this period, the probationer does not have a claim to his position and the University, through its officers, may exercise its prerogative of non-reappointment without a statement of reasons. [See Advisory Letters from the Washington Office, Letter Number Thirteen, "Stating Reasons for Nonreappointment" *AAUP Bulletin*, Vol. 50, No. 1, Spring, 1947.]

there was no secure permanent place for her. The President determined that tenure should be denied, believing (as explained in his testimony) that the conclusion of the English Department with respect to whether there was room for Plaintiff in its future should prevail against the interest of the Faculty Personnel Committee in advancing the excellence of lower division teaching. The President's negative decision was reported to the members of the Board of Regents at an informal meeting along with other negative decisions in tenure cases, but no formal recommendation was made to the Board by the President with respect to tenure for Plaintiff and no formal action was taken by the Board thereon. On June 10, 1971, Plaintiff was advised by letter from the Dean of the College of Arts and Sciences that she would not be granted tenure.

(d) "Full-time academic service" credited toward academic tenure must consist of teaching and/or research and/or extension work at the University in I, R, A or S categories.

(e) "Continuous service" means unbroken service, except that a maximum of one (1) year's leave of absence may be permitted in special circumstances. Such leave of absence will not count as part of the probationary period except by prior written agreement between the faculty member and his dean or director, and the approval of the Vice-President for Academic Affairs.

Section 2. *Tenure granted by the Board of Regents.* All full-time faculty in the University, with Board of Regents appointment in I, R, A, or S categories are eligible for academic tenure. Tenure may be granted in writing, by the Board of Regents, on the recommendation of the President, to a faculty member at the end of the probationary period or at any time prior to the termination of the probationary period. In the final year of the specified probationary period, the Board of Regents shall notify the faculty member by June 30 whether it will grant or refuse to grant tenure on July 1 of the succeeding fiscal year. If tenure is granted, the grant shall be non-revocable and the faculty member, without doing more, shall be tenured on July 1. If tenure is refused, the faculty member shall be offered a terminal year's contract. If notification of the granting of tenure or refusal of tenure is not given in writing by June 30 of the final year of probation, the faculty member shall receive tenure. Personal delivery of the notice in writing, or the mailing of the notice by certified or registered mail to the last recorded residence of the faculty member, on or before June 30 shall constitute an effective notification.

Section 3. *Duration of probationary period.* The normal probationary period for ranks 4 and 5 is a maximum of two years of full-time service in these ranks at the University, and at ranks 2 and 3, four years, in these ranks. The probationary period for any faculty member may be lengthened, or shortened, or eliminated by specific action of the Board of Regents. In no instance will a total of more than five academic years elapse between time of initial appointment and the Regents' decision. The Board of Regents shall notify the faculty member, in writing, of its

The foregoing summary does not include all of the committee and other consideration given to Plaintiff's tenure request prior to June 30, 1971, but is confined to those steps which appear to be relevant to the procedures outlined in Appendix A. The differences of opinion with respect to Plaintiff's tenure application reflected policy disagreements as to the desirable course of development of the English Department, specifically as to the tenuring of instructors without terminal degrees, with no substantial dispute as to

---

decision to lengthen, shorten, eliminate, or in any way alter the normal probationary period.

\*      \*      \*      \*

Section 12. *Procedures for recommending tenure.* The recommendation for or against tenure shall be initiated in the faculty member's academic department or academic division and passes via the chairman of the department or division to the appropriate dean or director for transmission to the Faculty Personnel Committee (FPC) who will review the case. The FPC will report to the President, who will forward these recommendations with his own to the Board of Regents for action.

The department or division's recommendations for tenure must be made after considering the candidate's teaching ability from proper sources of assessment, his research ability as judged from publications if applicable, his present and future value in the department, his relationships with faculty and students, and his service to the community. The general reasons for recommending tenure are that the candidate is and will continue to be an efficient and productive member of the department in terms of the criteria established for that department. All the evidence should be documented and presented, with a recommendation for or against tenure, as a dossier for transmission via the channels described above to the FPC. This dossier, together with the recommendations of the Department Chairman and the Dean will form the basis of the case to be made to the FPC.

The manner in which the recommendations are obtained will vary between departments. However, whatever the procedure employs, it must be orderly and show documented evidence of consultation between the Department Chairman and other faculty before submission to the FPC.

Section 13. *The Faculty Personnel Committee (FPC).* The Faculty Personnel Committee (FPC) shall consist of tenured faculty in Grade V including some representative and one alternate from each college, chosen by that college through secret ballot, together with five members chosen by the Faculty-at-large from a list of thirty eligible faculty drawn up by the Faculty Senate.

The members of the FPC shall be elected for a two-year term with approximately one-half of the members being elected each year at an election held late in the Spring. No member shall be eligible for reelection for three years after completion of his term of office. The chairman of the Faculty Personnel Committee shall be elected by the Committee. The college alternate may attend meetings and may vote in the absence of the college representative. The college alternate will normally be the next college representative, thereby assuring continuity.

Plaintiff's qualifications. During this period, it was the practice of the Board of Regents to refrain from considering tenure applications where the President did not recommend that tenure be granted, and negative recommendations were not submitted to the Board by the President.

In October, 1971, subsequent to the notification to Plaintiff of the denial of tenure, the University Faculty Senate Committee on Privilege and Tenure recommended that tenure be granted to Plaintiff. Plaintiff then met with the President, and asserted that review of her case had failed to consider whether she was discriminated against because of her sex. The President referred this question to the University's Commission on the Status of Women.[3] The parties are in disagreement whether the reference was pursuant to an agreement, it being Plaintiff's contention that the President agreed to be bound by the Commission finding. The Commission reported equivocally, indicating that denial of tenure appeared to have resulted from sex discrimination.[4]

---

The FPC does not usurp the rights of the department and college nor the functions of the Senate Committees on Privilege and Tenure and Academic Freedom.

The functions of the FPC are:

1) To consider recommendations for and against (a) promotion from ranks 2 to 3, 3 to 4, and 4 to 5 and (b) tenure for personnel in ranks 2, 3, 4, and 5.

2) To ascertain that the promotion or tenure recommendations have been properly considered by the department in an orderly manner, and that the pertinent information has been considered by the College Dean.

3) To receive, during the period of formulation and consideration of recommendation for promotion and tenure, submissions from faculty who are concerned about violations of procedures prescribed in this *Handbook* in any recommendation to the FPC.

Relevant documents are submitted from the department chairman or other unithead to his dean or director, who will add his own written comments and forward all written material to the FPC. The FPC will add its written report to the other material and forward everything to the President, who recommends appropriate action to the Board of Regents.

[3] The record does not disclose how the Commission came into existence. Apparently it was created and appointed solely by the President as an aid to the administration of the University, and had no statutory or other official status.

[4] The Commission based its conclusion upon the failure of any reviewing agency to consider the charge of sex discrimination, plus evidence that Plaintiff's status as a faculty wife was mentioned in the deliberations, together with the conclusion that the pattern of appointments and practice of the English Department disadvantaged women as a class.

The President concluded that the decision with respect to Plaintiff should not be reversed, and Plaintiff was so advised in May, 1972.

Plaintiff was employed for the academic year 1971-72 under a "terminal year" contract, in conformity with Sec. 2 of Appendix A, in a full-time instructional position. Plaintiff was employed for the academic year 1972-73 as an instructor, under a contract providing for only 91.667% of full-time, although Plaintiff contends that full-time service was rendered. The contract specified that the position was not tenured. She was not given a contract for the 1973-74 academic year, although she performed services for several months during discussions respecting her status.

Plaintiff brought this action against the Board of Regents, its individual members and the President of the University, seeking an order which would compel Defendants to grant tenure or, in the alternative, to consider her application *de novo* in accordance with proper procedure, and also seeking a declaratory judgment determining that she is presently tenured or that Defendants are estopped from denying her tenure. Plaintiff's complaint originally included a count alleging sex discrimination in violation of Section 4, Article I of the Hawaii Constitution. This count was dismissed with prejudice, by stipulation, upon Plaintiff's representation that she wished to preserve her cause of action under Title 7 of the Civil Rights Act of 1964 (42 U.S.C. 2000e). The trial court dismissed all of the remaining counts of the complaint as unsupported by the evidence, but amended the complaint to add an additional count founded upon the failure of the President to forward the recommendations of the English Department, the College of Arts and Sciences and the Faculty Personnel Committee, together with his own recommendation as to Plaintiff's tenure, to the Board of Regents in accordance with the procedure outlined in Section 12 of Appendix A. By judgment filed April 18, 1974, the court directed the President to forward these recommendations to the Board, and directed the Board to make its decision whether or not Plaintiff should be granted tenure, retaining jurisdiction until compliance with these directions, at which time the

action was to be dismissed. A final judgment was filed on August 7, 1974, reciting that the Board of Regents had complied with the judgment of April 18, 1974, and dismissing the complaint, but awarding costs to Plaintiff.

I

Plaintiff's principal contention is that pursuant to the provisions of Appendix A of the Faculty Handbook, Plaintiff acquired academic tenure by reason of an alleged failure of the Board of Regents to give notice of the refusal of tenure by June 30 of her final year of probation. Defendants stipulated at the trial that Appendix A contained the rules which governed the granting and awarding or the denial of tenure to Plaintiff. There being no showing of compliance with the rule-making procedures of the Hawaii Administrative Procedure Act, HRS Chapter 91, the provisions of Appendix A cannot be regarded as having the force of law. *Aguiar v. Hawaii Housing Authority*, 55 Haw. 478, 522 P.2d 1255 (1974). However, the published tenure policy of an educational institution may be incorporated by reference into the employment contract of a probationary faculty member, who may become entitled to tenure upon fulfilling the conditions of the tenure policy. *Bruno v. Detroit Institute of Technology*, 51 Mich. App. 593, 215 N.W. 2d 745 (1974); *Pima College v. Sinclair*, 17 Ariz. App. 213, 496 P.2d 639 (1972). In view of the stipulation, we need not pursue further any question of the incorporation of Appendix A into Plaintiff's employment contract, although the record before us would otherwise leave us with uncertainties.[5] For the purposes of this appeal, we accept *arguendo* that Plaintiff had a contractual claim to tenure if notification of its refusal was not given to her in writing by June 30, 1971, as required by Section 2 of Appendix A.

---

[5] The copy of the Faculty Handbook which is in evidence bears the date November 23, 1971, states that "some of the editorial adjustments . . . have not been officially approved" and refers to "intervening actions of the Board of Regents" for "current information".

The uncontradicted testimony disclosed an established practice in the administration of the University, pursuant to which the President determined which tenure applications should be denied and authorized notice of their denial, without recommendation to or formal action by the Board. In the case of Plaintiff, such a determination was made and Plaintiff received, prior to June 30, 1971, a letter over the signature of the Dean of the College in which her department was situated, advising her that she would not be granted tenure.

The trial court found that the procedures followed in Plaintiff's case deviated from those mandated by Appendix A in that the President, rather than the Board, made the determination that tenure should be denied. We do not agree. The Appendix A language, if it expressed a contract with Plaintiff, did so in light of Article IX, Section 5, of the Hawaii Constitution, which provides that the Board of Regents shall "exercise control over the university through its executive officer, the president of the university." We have no doubt of the power of the Board to delegate to the President the authority to make negative decisions in tenure cases, while implicitly reserving to itself the right to review such determinations upon proper application.[6] Plaintiff was advised by

---

[6] In so doing the Board follows the policy recommendation of the Commission on Academic Tenure in Higher Education, sponsored in 1971 by the Association of American Colleges and the American Association of University Professors. The Commission reported:

  The distinction between the de jure and de facto distribution of authority in American institutions of higher education is nowhere more evident than in the role of the governing board in faculty appointment and promotion. Though governing boards have the sole legal power to make appointments and confer tenure, they normally devolve that power upon the president and faculty, retaining only the formal exercise of authority and intervening in a substantial way only in crises. This distribution of real authority is fundamental: it is the only secure basis on which, according to the distinctive American practice, genuine professional standards can be maintained in institutions under lay control. In no well-administered college or university would a governing board substitute its own judgment in particular cases for that of the faculty and administration, any more than a lay board of a well-administered hospital would select a new chief of medicine except upon the recommendation of its professional director and staff. COMMISSION ON ACADEMIC TENURE IN HIGHER EDUCATION, FACULTY TENURE, 28 (1973).

Section 2 of Appendix A that "tenure may be granted . . . on the recommendation of the President." While elsewhere there is language which appears to contemplate the submission of negative recommendations to the Board, there is a complete absence of any provision with respect to the manner in which the Board shall dispose of tenure applications. Reading Appendix A as a whole convinces us that no assurance was given of formal Board consideration of tenure applications in the absence of favorable recommendation by the President. Thus the blanket denial of all tenure applications of which approval was not recommended by the President would not have violated any obligation to Plaintiff expressed in Appendix A. The judgment appealed from in the present case gave Plaintiff more relief than she would be entitled to under our reading of Appendix A, in requiring formal consideration of Plaintiff's application by the Board. Although Plaintiff asserts that the court erred in so directing the Board, such relief was consistent with the prayer of Plaintiff's complaint, and, in any event, cannot be regarded as prejudicial to her.

Our conclusion that the Board of Regents was not required to give specific deliberative consideration to Plaintiff's tenure application does not wholly dispose of Plaintiff's contentions. It is still necessary that we determine, from the record before us, whether the Board of Regents did in fact delegate to the President authority to make the negative decision on Plaintiff's application and to cause the required notice to be given. The trial court did not make the finding with respect to this question required by Rule 52(a), H.R.C.P.[7] However, we

---

[7] The trial court's finding was as follows:

9. President Cleveland made no recommendation to the Board of Regents concerning Plaintiff's application for tenure, and did not forward to the Board of Regents the recommendations referred to in Paragraphs 5 through 8 hereof. Purporting to act for the Board of Regents, he made the final negative decision concerning Plaintiff's application.

The trial court's conclusions of law were as follows:

2. Appendix A of the Faculty Handbook for the Manoa and Hilo Campuses, 1969 Revision, governed the procedures to be followed in reaching a final tenure decision concerning Plaintiff.

3. Section 12 of Appendix A required that the President of the University forward to the Board of Regents, for its independent review, the recommendation

may apply "the rule that insufficiency of the findings may be waived by the appellate court if, but only if, the record is so clear that the court does not need the aid of findings." *Mayer v. Alexander and Baldwin, Inc.*, 56 Haw. 195, 206, 532 P.2d 1007, 1010 (1975); *Lalakea v. Baker*, 43 Haw. 321 (1959); *Urbain v. Knapp Brothers Manufacturing Co.*, 217 F.2d 810 (6th Cir. 1954). We have examined the entire record with care, and have determined that the facts are not significantly in dispute as to this issue. There was admitted in evidence, without objection, a memorandum from the Chairman of the Board of Regents to the President, written after the denial of tenure to Plaintiff, confirming that negative recommendations as to tenure decisions had "never" been submitted to the Board by the President, and that it was the practice of the Board not to act on such negative recommendations. The President testified that the taking of the action of denying tenure had been delegated, by its practice, by the Board of Regents to its executive officer, the President. All members of the faculty who testified with respect to the subject confirmed their knowledge that the President did not take negative recommendations to the Board. It was also testified by the Dean of the College of Arts and Sciences, whose letter notified Plaintiff of the denial of tenure, that it was the practice that he would notify the candidate upon being advised of the action upon a tenure application. None of this evidence was controverted. We consider that the record is amply clear to enable us to dispense with the aid of a finding on this question, and conclude that the denial of tenure to Plaintiff and her notice thereof were supported by authority properly delegated by the Board of Regents. Plaintiff did not receive tenure by default of the University in acting upon her tenure application and in meeting the notice requirement.

---

made by him concerning Plaintiff, and the recommendations referred to in Paragraphs 5 through 8 hereof.

While it appears to have been the opinion of the trial court that delegation from the Board of Regents to the President of authority to make negative decisions on tenure applications was not permitted by Appendix A, we do not discover in its findings any determination, implicit or otherwise, on the factual question whether the Board did what was necessary to accomplish such a delegation if it possessed authority to do so.

II

Notwithstanding its conclusion that Plaintiff failed to qualify for tenure, the University continued to recognize her competence as an instructor by employing her for the academic years 1971-72 and 1972-73. Plaintiff asserts that such employment resulted in tenure under the 1940 Statement of the American Association of University Professors on Principles of Academic Freedom and Tenure, to which the University subscribed by Appendix A. Plaintiff relies on the following passage contained in the Statement: "After the expiration of a probationary period, teachers . . . should have permanent or continuous tenure." The argument is to the effect that, since the University would remain consistent with the A.A.U.P. Statement only if Plaintiff were employed in a tenured position, its employment of Plaintiff necessarily granted tenure to her.

Plaintiff's argument has two components. The first proposition is that, by subscribing to the A.A.U.P. Statement in Appendix A, the University bound itself to a rule from which it could not subsequently depart in writing its contracts with Plaintiff. The second proposition is that the attempt by the University to depart from the policy expressed in the Statement, by employing Plaintiff in a non-tenured position after the expiration of her probationary period, resulted in an unintended grant of tenure status to Plaintiff. Neither of these propositions is self-evident and we have difficulty with both. It is not apparent to us that the appropriate enforcement of the A.A.U.P. policy, if it were held to be binding on the University, would include the creation of tenure status in individuals whose qualifications had been expressly rejected. However, we do not reach the second proposition until the first is established. Plaintiff must demonstrate that the University, by publication of its Faculty Handbook, has done more than announce to its faculty the principles which shall govern their relationships in the absence of more particular and individual provisions. We have already pointed out that Appendix A, including the A.A.U.P. Statement, does not have the status of a rule pursuant to the Hawaii Adminis-

trative Procedure Act. We are not aware of any way in which Appendix A could create rights in Plaintiff except to the extent that it was incorporated by implication into Plaintiff's employment contracts or otherwise became the basis for a legitimate expectation that the policy there expressed would be applied in her case. We deal later with the significance of Appendix A as a possible foundation for a legitimate expectation, short of an implied contract provision. We consider here whether the University was free to make contracts with Plaintiff that excluded an implied incorporation of the A.A.U.P. policy. The post-probationary employment of Plaintiff was under such contracts.

The contract for 1971-72 is described in the testimony as a "terminal year" contract in conformity with Sec. 2 of Appendix A, and Plaintiff does not contend that it supports her tenure claim. She asserts that the 1972-73 contract was actually a full-time employment which could not be entered into by the University, consistently with the A.A.U.P. Statement adopted by Appendix A, unless Plaintiff held tenure status. However, the contract form was completed in a manner which expressly negated tenure, after Plaintiff had instituted the present litigation, with an attached memorandum which recited that the "appointment is without prejudice to either Ms. Abramson or the University with respect to her litigation claiming tenure in the University". Clearly, Plaintiff is not estopped by her acceptance of the contract from making any claim which the facts will support. Nevertheless she cannot alter the fact that the contract excluded, so far as the parties were capable, any implied contractual undertaking by the University to give tenure status to Plaintiff. In the face of the express contract, it is not possible to imply a different agreement incorporating the A.A.U.P. Statement. 3 CORBIN, CONTRACTS § 564 (1960).

It follows that the University was free to deviate from its announced policy in contracting with a non-tenured employee, and that the post-probationary employment of Plaintiff by the University did not confer tenure upon her. *Cf. Rhine v. International Y.M.C.A. College,* 339 Mass. 610, 162 N.E.2d 56 (1959). We express no opinion as to the effect which should

have been given to Appendix A, had it been incorporated without alteration into Plaintiff's contract.[8]

### III

Plaintiff also presents claims not founded upon her employment contract, asserting that she has been denied procedural due process to which she is entitled under the Fourteenth Amendment and has been denied the protection against arbitrary and capricious action afforded by the Hawaii Administrative Procedure Act, HRS Ch. 91. In effect, Plaintiff contends that, whether or not she obtained tenure by default under her employment contract, she had acquired rights which prevented denial of her tenure application in the manner it was dealt with by the University. However, Plaintiff does not contend that the University penalized her for the exercise of any constitutionally protected freedom or imposed any stigma or other disability that foreclosed her freedom to take advantage of other employment opportunities. The right claimed is only to procedural protection of an asserted property interest. *Board of Regents v. Roth,* 408 U.S. 564 (1972); *cf. Francis v. Ota,* 356 F.Supp. 1029 (D.C.Haw. 1973).

We agree that de facto tenure, consisting of the right to procedural due process before the termination of employment, may result where "a school's written and unwritten policies or practices grant qualifying employees a concrete expectancy that their future employment is secure". Matheson, *Judicial Enforcement of Academic Tenure: An Examination,* 50 WASH. L.R. 597, 600 (1975). However, it is clear that the Constitution does not create the requisite property interest or expectancy of employment upon which such de facto tenure must be founded, and that the interests which

---

[8] In Cusumano v. Ratchford, 507 F.2d 980 (8th Cir. 1974), where the A.A.U.P. Statement had been adopted by a University as a part of a teacher's contract, its provisions were held to be not mandatory and to be controlled by the express terms of the contract. The Commission on Academic Tenure in Higher Education, while continuing to disapprove such employment, recommends the elimination of statutes and regulations which create automatic tenure as the result of employment beyond the probationary period. FACULTY TENURE, *supra,* p. 58.

procedural due process protects stem from independent sources. For example, in *Perry v. Sinderman,* 408 U.S. 593 (1972), a provision in the college's faculty guide stated that the administration "wishes the faculty member to feel that he has permanent tenure as long as his teaching services are satisfactory and as long as he displays a cooperative attitude toward his co-workers and his superiors and as long as he is happy in his work." The United States Supreme Court held that the teacher was entitled to an opportunity to prove that he had a "legitimate claim of entitlement" to continued employment, and that such proof would obligate the college officials to grant a hearing in which he could challenge the sufficiency of the grounds for his nonretention. But if no University rule or policy created any legitimate claim to entitlement to re-employment, the protection afforded to property rights by the Constitution did not require the University to provide an opportunity for a hearing or a statement of reasons for denial of Plaintiff's tenure application. *Board of Regents v. Roth, supra; Sheppard v. West Virginia Board of Regents,* 378 F. Supp. 4 (S.D.W.Va. 1974).

In the present case, Plaintiff does not point to any written policy of the University which provides any assurance of her continued employment. Instead, Appendix A of the Handbook states expressly that a probationer does not have a claim to his position and that "the University, through its officers, may exercise its prerogative of nonreappointment without a statement of reasons."[9] Had the University employed Plaintiff, after completion of her probationary period, by a contract which did not negate the assertion of a reasonable expec-

---

[9]Appendix A, Sec. 1(c). By parenthetical reference, Appendix A directs attention to Advisory Letter #13, published by the A.A.U.P., which dealt with whether an institution has an obligation to provide probationary faculty members with a statement of reasons for their nonreappointment. The letter states:

> We could not agree, however, that if reasons are given for the nonreappointment the institution assumes a burden of demonstrating the validity of its reasons. To be sure, the faculty member may question whatever reasons are given him. But unlike the tenure teacher, he does not as a probationer have what can be considered a claim to his position, and it would thus seem unreasonable to compel the institution to account for this exercise of its prerogative, much less to carry the burden of justifying its decision.

tancy, under the A.A.U.P. Statement, of continued employment in tenure status, she might have argued with some force that this expectancy was entitled to constitutional protection whether or not a contractual right had been created. However, the post-probationary contracts negated any such expectancy. Plaintiff has attempted to show consistent acceptance by the President of the recommendations of the Faculty Personnel Committee and the Privilege and Tenure Committee in favor of tenure where opposed to departmental negative recommendations. We find these instances quite insufficient to support a legitimate claim of entitlement on the part of Plaintiff.[10] Moreover, the evidence relied upon fails to sufficiently detail the facts of these cases to enable us to find inconsistency in the President's action in Plaintiff's case. We conclude that no denial of procedural due process has been shown.

Plaintiff's reliance on the Hawaii Administrative Procedure Act fails for similar reasons. She seeks to apply the standards of judicial review of contested cases laid down in HRS § 91-14. But the applicability of these standards depends upon whether Plaintiff's tenure application created a "contested case" within the meaning of the Act. As defined in HRS § 91-1(5), a contested case is "a proceeding in which the legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for agency hearing." No requirement of a hearing on Plaintiff's tenure application has been shown. We need not inquire whether the University is an agency to which the Act applies in its employment relations. Without considering whether Plaintiff has made out a case of arbitrary or capricious action,[11] we conclude that the Hawaii Administrative Procedure Act does not assist Plaintiff.

[10]In Board of Regents v. Roth, *supra*, the fact that most teachers hired on a year-to-year basis were rehired was insufficient to create a "common law" of reemployment requiring procedural due process on a denial of contract renewal.

[11]The ground upon which the departmental negative recommendation was made in Plaintiff's case, being the lack of a secure permanent place for her at the tenure level, meets the standard of "permissible reasons" for nonappointment expressed by the Commission on Academic Tenure in Higher Education. FACULTY TENURE, *supra*, p. 70. Of course, we express no opinion with respect to the merits of the University's decision in Plaintiff's case or of its tenure policies in general.

The issue of sex discrimination was removed from this case by stipulation, but remains collaterally involved. Plaintiff entered into an arrangement with the President, as to the exact import of which the parties disagree, with the result that a report on her case was furnished by the University's Commission on the Status of Women. In this appeal, Plaintiff contends that an implied-in-fact contract was made by which the President was bound to follow the Commission's findings, and that such findings required that tenure be granted. We see many difficulties in this argument, not the least of which is the blanket finding by the trial court that none of the counts of Plaintiff's complaint were sustained by the evidence. Nevertheless, in the absence of specific findings, we have examined the record. We do not find, giving the testimony the interpretation most favorable to Plaintiff, any evidence of a contract pursuant to which a determination by the Commission would result in the grant of tenure to Plaintiff. At the most, Plaintiff's testimony suggests an agreement by the President to be bound by a determination of the Commission that sex discrimination existed in Plaintiff's case, the effect thereof upon Plaintiff's tenure application being not expressed in the alleged agreement. Upon the stipulated dismissal of the count of Plaintiff's complaint which alleged sex discrimination, it appears that the Commission's determination lost relevancy. Moreover, the determination of the Commission, as expressed in its report to the President, was only "that the failure of any reviewing agencies to consider the charge of sex discrimination plus the evidence that faculty wife status was brought into the deliberation, together certainly made a *prima facie* case of sex discrimination." Even if we were to assume that the parties agreed that a finding of sex discrimination by the Commission would be given some specified effect, it would appear that a finding of more than a mere prima facie case was required.

The trial court determined that the conduct of the parties had not resulted in conferring academic tenure upon Plaintiff. With this we agree. The trial court also concluded that Plaintiff was entitled to formal consideration of her tenure application by the Board of Regents, and directed that such

consideration take place. As is apparent from the foregoing, we do not agree that anything remained to be done to fulfill the University's obligation to Plaintiff. However, in the present posture of this case, there is no purpose to be served in reviewing this aspect of the judgment or the action taken by the Board pursuant thereto. The final judgment dismissed all counts of the complaint. Except with respect to the award of costs, we affirm the judgment. Defendants having prevailed in this case, they are entitled to be allowed their costs in the absence of any showing of fault on their part in the conduct of the litigation. H.R.C.P. Rule 54(d); *Abreu v. Raymond,* 56 Haw. 613, 546 P.2d 1013 (1976). The award of costs to Plaintiff exceeded the trial court's discretion.

The case is remanded for modification of the final judgment to award costs to Defendants. As so modified, the judgment is affirmed.

*John S. Edmunds* for Plaintiff-Appellant, Cross Appellee.
· *Shirley Smith,* Deputy Attorney General, for Defendants-Appellees, Cross Appellants.

DISSENTING OPINION OF OGATA, J.,
WITH WHOM KOBAYASHI, J., JOINS

The Board of Regents adopted Appendix A (as it read at the time material to this action)[1] sometime in 1969, the same year that President Cleveland first came to the University. Appendix A outlines specific procedures which culminate in the granting *or* refusal of tenure "by the Board of Regents" [Sections 1(c) and 2] and labels the decision as "The Regents' decision" [Sections 3 and 9]. Section 13 of Appendix A states that the Faculty Personnel Committee "will forward everything to the President, who recommends appropriate action

---

[1]There was testimony that there had been a 1964 Faculty Handbook, but the record does not show what was contained in that Handbook, the parties having agreed at trial that the 1964 version was irrelevant to this action. There was also testimony that an updated version of the 1969 Faculty Handbook was adopted by the Board of Regents in 1973. The 1973 version of Appendix A is identical to the 1969 version. Nothing in the 1973 version of Appendix A mentions the alleged delegation of authority to deny tenure to the President of the University.

698

to the Board of Regents.'' Section 12 states that ''The President . . . will forward these recommendations to the Board of Regents for action.'' President Cleveland's testimony on cross-examination indicates that he believes that the ''practices'' he follows are different than what appears in Appendix A. The trial court concluded that Section 12 required the President to forward to the Board of Regents, for its independent review, the recommendations made at the various levels of administration. I find no error in that conclusion and disagree with the majority on that point. *Compare, Silverman v. University of Colorado*, 541 P.2d 93, 97 (Ct. App. 1975).

In their cross-appeal, the Defendants contend that Appendix A fails to define what ''action'' the Board of Regents is to take, despite the language contained therein that ''the Regents' decision'' is to ''grant or refuse to grant tenure'' [Sections 1(c), 2, 3 and 9]. In view of this alleged omission, they further urge us to find that, according proper weight to the prior and allegedly uninterrupted practice of non-review by the Board, the decision to refuse to grant tenure was in fact delegated to the President in this case because the Board of Regents did not act at all. Of course, the inaction by the Board is readily explained by the trial court's finding, which appears from the record to be undisputed, that in 1971 the President made no recommendations to the Board of Regents concerning Plaintiff's application and did not forward the recommendations made at other University levels of administration to the Board of Regents for action.

The Defendants' legal contention is that under Article IX, Section 5 of the Hawaii Constitution and under HRS§§ 26-11, 304-3, 304-11, the Board of Regents has the right and authority to delegate to the President of the University the decision to deny tenure. I have no quarrel with this proposition of law. *See, e.g., State ex rel. Bourgeois v. Board of Sup'rs.*, 205 La. 177, 17 So. 2d 25 (1944); *Cathcart v. Anderson,* 10 Wash. App. 429, 517 P.2d 980 (Ct. App. 1974); *Papadopoulis v. Oregon State Board of Higher Education,* 14 Ore. App. 130, 511 P.2d 854 (1973), *cert. denied,* 417 U.S. 919 (1974); *Sheppard v. West Virginia Board of Regents,* 378 F. Supp. 4 (D.C. W. Va. 1974),

*affirmed,* 516 F.2d 826 (1975); *Stebbins v. Weaver,* 396 F. Supp. 104 (W.D. Wis. 1975). And, despite Defendants' representations in their brief to the contrary, the trial court made no ruling that the Board lacked the power to so delegate its authority. Defendants ask us, however, to leap from the proposition that the Board is legally empowered to delegate the decision to deny tenure to the conclusion that it must have been delegated in this case because the President of the University is the executive officer of the Board.

But what effect are we to give the policy formally adopted by the Board of Regents,[2] reduced to writing,[3] and published as Appendix A to the Faculty Handbook?[4] The parties have agreed from the inception of this action that Appendix A governs the granting and awarding or the denial of tenure to Plaintiff. The trial court so concluded. To accept the Defendants' contention is to hold that, despite the stipulation and the language used in Appendix A, Appendix A has no legal effect where the executive officer of the Board of Regents ignores it. While the nature of Appendix A need not be

---

[2] See Article IX, Section 5 of the Hawaii Constitution and HRS § 26-11.

[3] Appendix A begins: "The University of Hawaii subscribes to the A.A.U.P.'s 1940 *Statement of Principles of Academic Freedom and Tenure* . . . ."

The A.A.U.P. Statement states:

"Academic Tenure

\* \* \* \* \*

(1) The precise terms and conditions of every appointment should be stated in writing and be in the possession of both institution and teacher before the appointment is consummated."

*Academic Freedom and Tenure, 1940 Statement of Principles and Interpretive Comments,* 56 AAUP BULLETIN 323, 324 (1970). *See also* Interpretive Comment 6, *id.* at p. 326.

In speaking about the above-quoted principle the following comment has been made:

"Good practice requires that the institution (department, college, or university) define . . . its procedures for reaching decisions on these matters. The 1940 Statement of Principles prescribes that 'The precise terms and conditions . . . be stated in writing . . . .' Committee A also believes that fairness to the faculty member prescribes that he be informed, early in his appointment, of the substantive and procedural standards which will be followed in determining whether or not his appointment will be renewed or tenure will be granted."

Committee A on Academic Freedom and Tenure, *Procedural Standards on the Renewal or Nonrenewal of Faculty Appointments,* 56 AAUP BULLETIN 21, 22 (1970).

[4] *Id.*

decided in this case, I cannot reduce it to the insignificance required by Defendants' contentions. Moreover, assuming arguendo as the majority does that Appendix A was incorporated into Plaintiff's contract, the President's action in assuming the authority to deny tenure could not modify the contract without Plaintiff's consent. In continuing her employment for the requisite number of years, she became entitled to be considered for tenure in accordance with Appendix A.

The majority opinion finds from its review of the parol evidence in the record the fact that the Board of Regents delegated to the President the decision to deny tenure. However, the trial court found that the decision to deny tenure was not in fact delegated. In this case, the trial proceeded in large part on the theory that President Cleveland's failure to forward certain recommendations to the Board of Regents for the granting or refusal of tenure constituted the breach of a duty owed to Plaintiff. Defendants' primary defense was that the duty was not breached because the Board in fact performed by delegating to the President the authority to deny tenure. After rejecting Defendants' proposed finding of fact that the President was "[a]cting for the Board of Regents," the trial court made the finding that President Cleveland was only "[p]urporting to act for the Board of Regents." (Emphasis added.)

The federal practice is that findings of fact made by the trial court pursuant to F.R.Civ.P. 52(a) are to be construed liberally in support of a judgment or order, even if the findings are not as specific or detailed as might be desired. *Triangle Conduit & Cable Co. v. FTC*, 168 F.2d 175, 179 (7th Cir. 1948), *aff'd*, 336 U.S. 956 (1949); *Carr v. Yokohama Specie Bank, Limited*, 200 F.2d 251, 255 (9th Cir. 1952); *Travelers Insurance Company v. Dunn*, 228 F.2d 629, 631 (5th Cir. 1956); *Zimmerman v. Montour Railroad Company, Inc.*, 296 F.2d 97 (3d Cir. 1961), *cert. denied* 369 U.S. 828 (1962); *Blumenthal v. United States*, 306 F.2d 16 (3d Cir. 1962); *Wells-Benz, Inc. v. United States*, 333 F.2d 89 (9th Cir. 1964); *Manning v. Jones*, 349 F.2d 992, 996 (8th Cir. 1965). *See also Elam v. United States*, 250 F.2d 582 (6th Cir. 1958). This rule

is not in conflict with this court's decisions in *affirming* the trial court's judgment where "the record is so clear that the court does not need the aid of the findings", *Mayer v. Alexander and Baldwin,* 56 Haw. 195, 532, P.2d 1007 (1975); *Lalakea v. Baker,* 43 Haw. 321 (1959), or in remanding for the entry of findings of fact where the basis of the trial court's decision is unclear. *Upchurch v. State,* 51 Haw. 150, 454 P.2d 112 (1969). The test drawn from these cases is whether the findings of fact actually made afford the reviewing court a clear understanding of the ground for the trial court's decision in light of the record.

Principally, Defendants urge upon us the conclusory statements repetitively made by President Cleveland at the trial as establishing the fact that the Board of Regents actually delegated to him the authority to deny tenure. A reasonable interpretation of the trial court's finding, however, is that the trial court rejected the evidence urged upon us.

The record is silent on what procedures were required by the 1964 Faculty Handbook for consideration of application of tenure.[5] President Cleveland testified that prior to his term of office which began sometime in 1969, the Board of Regents refrained from considering all recommendations for tenure — either positive or negative. Doctor Potter, a faculty member who as former associate dean for Academic Development edited the 1969 Faculty Handbook, testified that in 1970 he had advised President Cleveland that it was his opinion (which remained unchanged at trial) that the President was required by Appendix A, then recently adopted, to take both positive and negative recommendations to the Regents for their action and that in 1970, still within President Cleveland's first year, he had accompanied the President when the President presented to the Board of Regents the recommendations for granting and refusing tenure. President Cleveland testified that it was at his own suggestion, however, that the Board of Regents changed its prior practice so that it began to consider positive recommendations for tenure

---

[5] *See* footnote 1, *supra.* Doctor Potter testified that the "tenure by inadvertence" clause in Section 2 of Appendix A was the unwritten practice at the University prior to the 1969 adoption of Appendix A.

but continued to refrain from considering negative decisions. The record shows that beginning in 1971, the year material to this case, President Cleveland assumed the responsibility of deciding who would be denied tenure. At the 1974 trial, Doctor Potter admitted he knew President Cleveland has been following this practice since 1971. Dean Contois also testified that he knew of this unwritten practice without specifying when it had started. The majority infers from this history that the Board of Regents must have affirmatively delegated to the President the authority to deny tenure. But there is no evidence showing that the Board took any such affirmative action in derogation of its adopted written policy. To the contrary, in 1973 the Board negated any such inference by readopting Appendix A without making any change in its written provisions which reserve to the Board the decision to grant or refuse to grant tenure.

In my opinion, in light of the factual issues raised at trial, the trial court's failure to enter an explicit finding that the President was in fact acting for the Board as proposed by Defendants, coupled with the entry of its above-quoted finding of fact and its judgment against Defendants, is tantamount to a finding that the authority to deny tenure was not delegated to the President. This is the only logical and reasonable conclusion to be drawn from the record. Even if a different inference could be made, that would not be reason to set aside the trial court's finding. H.R.C.P. Rule 52(a); *Viveiros v. State*, 54 Haw. 611, 513 P.2d 487 (1973); Wright and Miller, Federal Practice and Procedure § 2585, pp. 732-733.

Having considered that the Defendants' cross-appeal does not merit reversal of the trial court, I turn now to Plaintiff's contention that the trial court erred because, while it found that Appendix A governed the granting and awarding or denial of tenure, it refused to enforce what Doctor Potter called the "tenure by inadvertence" clause in Section 2 of Appendix A. Self-executing provisions like Section 2 have been enforced in other states. *See, e.g., Papadopoulis v. Oregon State Board of Higher Education*, 14 Ore. App. 130, 511 P.2d 854 (1973), *cert. denied*, 417 U.S. 919 (1974); *Pima*

*College v. Sinclair,* 17 Ariz. App. 213, 496 P.2d 639 (Ct. App. 1972). *Compare* cases where the granting of tenure depended upon an affirmative act: *King v. Board of Regents, Claremont Junior College,* 541 P.2d 836 (Okla. 1975); *Sheppard v. West Virginia Board of Regents,* 378 F. Supp. 4 (D.C. W. Va. 1974), *affirmed,* 516 F.2d 826 (4th Cir. 1975). *See also* 3A Corbin on Contracts, § 684, pp. 230-231.

Plaintiff claims the fact that Dean Contois notified her prior to the automatic tenure date that her tenure application would be denied and the fact that several university agencies recommended that tenure be denied in her case are irrelevant. These facts would be equities against granting an equitable remedy such as specific performance of an employment contract. *See* Dobbs, Handbook of the Law of Remedies 929 (1973); Hanbury, Modern Equity 46-47 (9th ed. 1969). In order to put the injured party in as good a position as he would have had if performance had been rendered as promised, some courts have held that an award of damages is the appropriate remedy. *Bruno v. Detroit Institute of Technology,* 51 Mich. App. 593, 215 N.W.2d 745 (1974); *cf. Papadopoulis v. Oregon State Board of Higher Education,* 14 Ore. App. 130, 511 P.2d 854 (1973), *cert. denied* 417 U.S. 919 (1974); *Zimmerman v. Minot State College,* 198 N.W.2d 108 (N.D. 1972).

But the concept of tenure is a property interest or right created by Appendix A which is cognizable at law. I am convinced from the weight accorded to tenure by the parties and my review of the case law, including *Board of Regents v. Roth,* 408 U.S. 564 (1972), and *Perry v. Sindermann,* 408 U.S. 593 (1972), that tenure is a unique right. Since the notice sent by Dean Contois was ineffective to toll Appendix A's automatic tenure provision, *cf. Papadopoulis v. Oregon State Board of Higher Education, supra,* 511 P.2d at 875, I would hold that Plaintiff has acquired the right to continued renewal of her contract in accordance with the provisions of Appendix A. *Compare, Greene v. Howard University,* 412 F.2d 1128 (D.C. Cir. 1969); *Pima College v. Sinclair,* 17 Ariz. App. 213, 496 P.2d 639 (1972). Therefore, I would remand this case to the trial court for the entry of an order which conformed to my opinion.