ASSOCIATED ENGINEERS & CONTRACTORS, INC., and CHRIS BERG, INC., Plaintiffs-Appellees, Cross Appellants *v.* STATE OF HAWAII, Defendant-Appellant, Cross-Appellee

NO. 5595

JULY 7, 1977

RICHARDSON, C.J., OGATA, MENOR AND KIDWELL, JJ., AND CIRCUIT JUDGE KATO, IN PLACE OF KOBAYASHI, J., DISQUALIFIED

188

OPINION OF THE COURT BY KIDWELL, J.

This case arises out of a contract made between Plaintiffs-Appellees, Cross-Appellants (Contractor) and Defendant-Appellant, Cross-Appellee (State) for the construction by the Contractor of an observatory building at the top of Mauna Kea. The contract was entered into on September 8, 1967 and required final completion of the work (after extensions granted by the State) on July 17, 1968. The work was substantially completed on December 19, 1969, and was finally inspected by the State on January 30, 1970. The contract price, as specified in the contract, was $2,049,500, and by agreed change orders was adjusted to $2,052,938.97. This action was bought by the Contractor for unpaid portions of the contract price, together with additional compensation claimed in the amount of $1,554,610.65. The State counterclaimed for liquidated damages and for additional costs incurred under a telescope installation contract and an engineering consultant contract by reason of the Contractor's delay. After an extended trial, judgment was entered as follows:

1. Defendant shall pay to Plaintiffs the following amounts:

(a) $32,797.09 as and for the increased cost of welding the dome skin joints;

(b) $17,584.28 as and for the deletion of "Alternate No. 2" ;

(c) $60,432.75 as and for the increased cost of welding the dome structural connections with double Vee welds instead of single Vee welds;

(d) $52,173.00 as and for reimbursement of all jobsite and other indirect expenses incurred by Plaintiffs during the extended period of 51 calendar days required to perform the work described in paragraphs 1(a), (b), and (c) above.

2. Plaintiffs shall pay to Defendant the following amounts:

(a) $154,000.00 as and for liquidated damages for tardy completion of the project;

(b) $48,229.00 as and for reimbursement for damages paid to Perkin-Elmer;

(c) $1,000.00 for deletion of the position encoders;

(d) $1,451.06 as and for reimbursement for expenses incurred by Defendant in locating Inspector Race.

The agreed performance period embraced the winter months and the Contractor encountered cold, winds, snow and ice. It was claimed that the State knew or should have known that completion of the work during the contract period would be impossible because of weather conditions, that relevant weather information was withheld from the Contractor, and that the State represented or warranted that the weather would be mild enough to permit completion during the contract period. These circumstances were relied on by the Contractor both as relieving it from liability for liquidated damages during the portion of the delay in performance attributable to weather conditions and as entitling it to reimbursement of its extra costs resulting from the same cause. The Contractor was required by the State to perform

welding and other work in the construction of the observatory dome in accordance with interpretations of the specifications which the Contractor disputed, and claim was made for the cost of such work together with relief from liquidated damages during the period of delay so occasioned. The claim also included miscellaneous items in a relatively small amount, together with claim preparation costs and interest.

The trial court allowed a portion of the Contractor's claim for increased costs of dome construction resulting from the State's interpretation of the specifications and denied the claim in all other respects. The State's counterclaim for liquidated damages was allowed, except with respect to that part of the delay period attributable to dome construction for which the Contractor was awarded compensation. The State was allowed its increased costs of the telescope installation contract. Both parties have appealed. However, the Contractor has raised no question with respect to items 2(c) and (d) of the judgment.

On the Contractor's appeal, we affirm the judgment in favor of the State (Paragraph 2(a) to 2(d), inclusive). On the State's appeal, we reverse the judgment in favor of the Contractor (Paragraphs 1(a) to 1(d), inclusive) and remand the case for further proceedings.

During the trial, the Contractor assisted a material witness for the State to obtain mainland employment and to travel to the mainland, in order to make him unavailable to the State. By item 2(d) of the judgment the State was reimbursed its expenses of locating the witness on the mainland. The State sought to amend its answer to assert, as an affirmative defense against the claim, that the Contractor had attempted to practice fraud in the proof of the claim. The amendment was denied and the trial court refused to consider this defense. We direct that this amendment be allowed in further proceedings on remand.

The State incurred expenses in taking the deposition of an employee of the Contractor, for which it sought reimbursement as costs of proving a fact which the Contractor had failed to admit on request. The application for reim-

bursement was denied by the trial court. We affirm this action of the trial court.

To avoid lengthy repetition, the facts relevant to each of the issues on this appeal will be stated in the part of this opinion devoted to the particular issue.

I

*The claim for damages from delay in performance caused by adverse weather conditions.*

The Contractor computes its claim for weather delay damages by attributing to this cause 376 of the 554 calendar days which elapsed between the contract completion date of July 25, 1968 and the final inspection by the State on January 30, 1970. Assessing its jobsite and other indirect expenses at the rate of $1,023 per calendar day, the Contractor arrives at the sum of $384,648 as the amount which it is entitled to recover from the State as weather delay damages.[1] No findings were made by the trial court with respect to the period of delay in completion of the contract caused by adverse weather conditions. We assume arguendo that the Contractor's computations are correct and turn to the question whether the evidence sustained the alleged liability of the State to indemnify the Contractor for its costs attributable to adverse weather conditions. The Contractor advances the following legal propositions in support of its claim:

---

[1] The Contractor sought delay damages of $500 per day for the period between substantial completion (December 19, 1969) and final inspection (January 30, 1970). Presumably, all weather delays were claimed to have occurred prior to substantial completion. The computation set out in the Contractor's brief discloses that all delays from adverse weather are treated as compensable. However, the claim submitted by the Contractor to the State and incorporated by reference into the complaint (presented in August 1969 prior to substantial completion) estimated the completion date as October 25, 1969 and attributed only 165 calendar days of the delay to weather conditions which could not have been reasonably anticipated from a reading of the contract documents or from information available to the Contractor prior to bidding. (Ex. 85, p. 46)

(a) The State has an affirmative duty to disclose its superior knowledge where it possesses special knowledge, not shared by the contractor, which is vital to the performance of the contract.

(b) Where the State in inviting bids discloses certain facts regarding site conditions, it may not conceal other facts within its knowledge which materially qualify those stated.

(c) Where the State in inviting bids makes positive representations as to certain existing conditions material to the performance of the contract, the contractor may rely on the representations despite a general provision requiring him to investigate the site.

(d) The State implicitly warrants in a construction contract that if the contractor complies with the specifications furnished he will be able to complete the project within the specified time.

The Contractor also seeks to base its claim for weather delay damages on the refusal of the State to suspend work on days of adverse weather. This argument will be dealt with after the above propositions have been considered.

Each of these propositions has some validity under appropriate factual situations. However, the trial court was requested by the Contractor, and refused, to find that the State contributed to the delayed completion of the contract by not fully informing the Contractor of weather conditions the State knew could be expected on Mauna Kea, and to find that it was not feasible to complete the contract work in the contract period. On the other hand, the trial court found that the Contractor failed to conduct a reasonable investigation of Mauna Kea's weather and climate conditions before bidding, and that the State did not withhold any information on such weather and climate.[2] With respect to raw weather data

---

[2] The Contractor asserts that substantial evidence was lacking to support these findings, but fails to provide a statement of the particulars wherein the findings are alleged to be erroneous, as required by Supreme Court Rule 3(b) (5). We have satisfied ourselves that the record contains substantial evidence supporting the findings.

accumulated by the State, the trial court found that the Contractor was aware that such data existed and did not ask to see them.

The standard which governs our review of these findings of the trial court was enunciated in *J.A. Thompson & Son, Inc. v. State,* 51 Haw. 529, 465 P.2d 148 (1970). There the plaintiff had entered into a contract with the State for the construction of a highway. The action was brought to recover additional costs alleged to have resulted from the State's misrepresentation of material facts or its failure to disclose all material information in its possession. In affirming a judgment against the plaintiff, entered after a trial without a jury, we said:

> Further, the gist of the appeal is that the trial court erred in its finding that the State had not misrepresented fact and that it had not failed to disclose material information which it had in its possession; however, the plaintiff has failed to prove that the findings of fact of the trial court are clearly erroneous, because under the record of this case we are not left "with a definite and firm conviction that a mistake has been committed by the trial court." *Id.,* p. 539.

Our review here must also take into account the fact that the findings fail to fully dispose of the issues raised by the Contractor in its claim for weather delay damages. No findings were made with respect to the alleged "positive representations" as to existing conditions material to the performance of the contract. However, we have found the record to be sufficiently clear that we do not need the aid of additional findings in reviewing the judgment which denies this portion of the Contractor's claim. *Mayer v. Alexander & Baldwin, Inc.,* 56 Haw. 195, 206, 532 P.2d 1007, 1010 (1975); *Abramson v. Board of Regents,* 56 Haw. 680, 548 P.2d 253 (1976).

We turn now to consideration of the various contentions made by the Contractor in support of this claim.

A.

*The alleged failure of the State to disclose information with respect to weather conditions.*

Under this head, we will consider both propositions (a) and (b) advanced by the Contractor. It is contended that the State had an affirmative duty to disclose the weather data in its possession, independently of what information it supplied to the bidders, and also that the duty to disclose arose out of the fact that such weather data materially qualified the information supplied to the bidders.

A witness produced by the Contractor testified that he had examined at the Department of Astronomy of the University of Hawaii extensive and detailed meteorological data filling ten cardboard boxes, covering observations made at several sites on Mauna Kea and also at the observatories located on Mauna Loa and Haleakala. There was also testimony that the Department of Astronomy possessed a dozen volumes of bound manuscript records of meteorological data accumulated on Mauna Kea. The existence of these records seems not to be disputed, and it may be assumed that the data related to the years immediately prior to the letting of the contract. The Contractor's brief argues the relevance of these records in the following terms:

> It is apparent that (1) the 10 cardboard boxes and 12 bound manuscripts which were possessed by the State contained vital information concerning the weather conditions at the site; (2) the weather conditions were of paramount importance in the performance of the Contract; (3) the State deliberately chose not to reveal the information in the boxes and manuscripts to the Contractor; (4) the Contractor bid with knowledge of the existence of a weather data collection but without knowledge of its contents; and (5) the Contractor encountered adverse weather conditions which were not reasonably foreseeable, thereby resulting in lengthy delays in the performance of the contract.

However, no attempt was made by the Contractor to bring these records before the court and the evidence as to what

data were contained in them is in most respects ambiguous and inconclusive. It is difficult to determine, from second-hand descriptions by witnesses who examined the records, to what extent they would have forewarned the Contractor of the adverse weather conditions actually encountered. In this respect the case is different from *Hardeman-Monier-Hutcherson v. United States*, 458 F.2d 1364 (Ct. Cl. 1972), upon which the Contractor chiefly relies. There the government let a contract for construction of a pier at a remote location on the southern coast of Australia. It was of critical importance to bidders to determine the extent to which adverse wind and sea conditions would interfere with construction. Certain reports in the possession of the government forecast far worse conditions than should have been anticipated on the basis of information available to bidders. Prior to submitting its bid, the successful bidder learned of the reports and asked permission to examine them, which was refused. Adverse weather conditions of the sort indicated by the reports were encountered during construction and delayed the completion of the project. In the contractor's action for its extra costs, the reports were brought before the court and it was found that they had accurately forecast the weather and sea conditions actually encountered. It was held that the delay was caused by the act of the government in failing to disclose the reports and that the withholding of the reports was a breach of the construction contract. The decision is expressly founded upon the fact that the reports contained information which was vital to the performance of the contract and the further fact that the information was deliberately withheld by the government.

In the present case, the State furnished to the bidder information with respect to wind speeds at the construction site during the period from November, 1965 to October 1966, inclusive, and with respect to temperature maximums and minimums at the site during the period from August, 1965 to October, 1966, inclusive. These data were accurate, so far as they went. The State possessed, during the bidding period, daily temperature figures for the period from November, 1966

to June, 1967, inclusive, which were not disclosed to bidders. The temperature data provided to bidders for the period November, 1965, to October, 1966 showed average maximum temperatures in excess of 40° for all months except February, and in excess of 50° for March and for May through September. The undisclosed temperature data for November, 1966 through June, 1967 were not expressed in terms of monthly average maximums, but showed (with the omission of late March and early April) the daily maximum temperatures between 6 AM and 6 PM. The daily maximum temperature exceeded 40° only on one day during November through January, on 6 days in February and on 3 days in March. Temperatures in excess of 50° were recorded only in May and June.

Other than with respect to the temperature data for November, 1966 through June, 1967, the record does not disclose the nature of the weather data possessed by the State and not provided to the bidders, except in the most general terms.[3] While testimony offered by the Contractor supports the conclusion that such data would have assisted in forecasting weather conditions during the construction period, there is nothing to tell us whether a forecast based on such data would have been different from one based on data otherwise available to bidders. With respect to the data other than the temperature readings for the 1966-67 winter, the record clearly would not support a finding that the State withheld material information from the Contractor. The temperature data for the period November, 1966 through June, 1967 meets the test of materiality, in light of contract provisions which forbade the doing of important aspects of the work except when the temperature was above 40° and

---

[3] The record contains the following:

"Q: Now the testimony will be, Dr. Miyake, that during the construction of this project in 1967, '8 and '9, that there were extremely high winds, icing conditions, blizzards, many feet of snow, very cold temperatures. From the data available in 1967 to the University of Hawaii and based on your knowledge and experience, would you have expected this?

"A: As a meteorologist, yes, I would expect that." (Tr. p. 789)

rising. An intelligent bid necessarily required an estimate of the periods during which such restrictive provisions would be in operation and the practicability of using heating devices to enable the work to proceed during periods of low temperatures. On the other hand, the Contractor bid with knowlege of the existence of a collection of weather data and made no request for its use.[4]

It is most difficult for us to understand the conduct of either of the parties with respect to the vital question of the weather conditions to be anticipated during the construction period. Although aware that records of weather observations had been collected by the State, during the winter which had intervened between the period covered by the weather information provided to bidders and the bid opening, the Contractor showed no interest in such data and made no request to review such records. On the other hand, the State provided only weather information relating to the 1965-66 winter, despite the fact that it possessed more recent and presumably more relevant weather data. The Contractor has urged on us that some of the testimony tends to show that the State actively concealed such information from the bidders. However, this question was resolved by the finding of the trial court that the State did not withhold from the Contractor any information on Mauna Kea's weather and climate. Thus the question becomes whether the State had an affirmative duty to disregard the Contractor's complacency and to ensure that the Contractor was armed with the 1966-67 weather information, as well as that for 1965-66, in making its bid.

There is no contention that such a duty of disclosure existed with respect to information in the possession of the State which was not material to the formulation of its bid by the Contractor. The Contractor has attempted to show the materiality of the weather data for the winter of 1966-67 by

---

[4] As was testified by Mr. Norman Berg, one of the Contractor's principals, he observed weather data being collected on July 14, 1967, but had in hand the data for August, 1965 through October, 1966, and "if I did find a room-full of information that accumulated over several years, I wouldn't know what to do with it anyway." (Tr. p. 1280)

showing a parallel between the conditions at the site during that winter and those encountered during construction the following winter. The Contractor provided testimony to the effect that it derived from the temperature information furnished by the State for the 1965-66 winter a forecast of temperatures which would be encountered in construction, which forecast was substantially more favorable than either the conditions actually encountered or the conditions shown by the State's weather data to have prevailed in the winter of 1966-67. However, this weather forecast was not made by a meteorologist and there is nothing to show that it represented a sound use of the data available to the Contractor. Although the Contractor offered extensive testimony by an expert in meteorology, this witness testified only that the data in the possession of the State would have been useful to the Contractor in forecasting the weather conditions which should have been anticipated and provided no testimony with respect to what forecast of weather conditions should have been made with the use of that information. We cannot supply the omission. There is nothing in the record to show what temperatures the Contractor should have anticipated on the basis of the information furnished by the State and otherwise available to the Contractor, or what temperatures the Contractor should have anticipated had such information been supplemented by the temperature data for the 1966-67 winter which the State possessed. The record shows that there were a number of sources of weather information available to but not resorted to by the Contractor.

The Contractor was free, at its own risk, to guess at the temperature conditions to be anticipated during construction, without employment of reasonably available expert advice and without utilization of reasonably available weather information, but it may not hold the State responsible for its error. Even if it be assumed that the State withheld weather information in violation of a duty which it owed to the Contractor, it was incumbent on the Contractor to show that possession of such information would have made a material difference in the forecast which the Contractor should reasonably have made on otherwise available information.

The Contractor has offered no evidence to sustain this burden.

B.

*The alleged representations of weather conditions.*

The Contractor contends that false representations of conditions at the site were made by the State, as follows:

1. The State provided temperature data for the period from August, 1965 to October, 1966 and wind data for the period from November, 1965 to October, 1966.

2. The specifications required certain work to be performed when the temperature was at least 40°F and rising or 50°F and rising.

3. The contract did not contain "cold weather specifications", i.e., specifications which would require the Contractor to create an artificially warm environment so as to protect the work from the effects of severe weather.

It is argued that the State affirmatively represented that the weather during the 1967-68 construction period would not be worse than that of the winter of 1965-66 as shown in the State's weather data, that the temperature would be above 40°F and 50°F as needed to permit compliance with the specifications without delay and that cold-weather provisions would not be necessary for construction. We are referred to no authority for reading into these data and specifications any representation of future conditions. The most that can be said in support of the Contractor's contention, we believe, is that the Contractor had some basis for believing that normal weather conditions were consistent with the inferences that might be drawn from these data and specifications. But the risk of abnormal weather is borne by the contractor even where the contract provides for relief if unknown and unusual conditions are encountered. *Hardeman-Monier-Hutcherson v. United States, supra.* A warranty that the progress of construction will not be impeded by abnormal weather conditions will not easily be implied. *Lenry, Inc. v. United States,* 297 F.2d 550 (Ct. Cl. 1962). The Contractor has not shown any representation by the State of the weather

conditions which would be encountered at the site of the work.[5]

## C.

*The alleged warranty that compliance with the specifications would enable the Contractor to complete the project within the specified time.*

The final proposition which the Contractor advances in support of its claim for weather delay damages is founded on a line of cases which deal with delays in performance of building contracts which result from some failure or inadequacy of portions of the work which the contractor constructed in accordance with the specifications of the contract. *Cf. Wunderlich Contracting Co. v. United States,* 351 F.2d 956 (Ct. Cl. 1965). In such cases, contractors have been awarded their damages under an implied warranty that compliance with the specifications will produce work which will enable the contract to be completed. The Contractor seeks here to extend the principle of these decisions into a warranty that weather conditions prevailing during construction will permit the contract specifications to be complied with. The logic of these decisions does not permit such an extension.

In its attempted application to the facts of this case, this proposition is identical with that which we have just dealt. Under both propositions, the Contractor seeks to make the State a warrantor of weather conditions. We have been referred to no authority holding that a requirement that work be performed only under certain weather conditions is,

---

[5] Proof of the weather conditions which should have been forecast from the weather data in the possession of the State would be required in assessing the Contractor's damages attributable to the withholding of the information by the State, even if the issue which we deal with here were resolved in the Contractor's favor. The record contains nothing which would have enabled the trial court to determine how much of the delay in completion was attributable to weather conditions which the Contractor should not have anticipated upon the information available to it but which should have been forecast from the data in the possession of the State. However, we do not reach the question of the sufficiency of the Contractor's proof of damages.

without more, a warranty that such weather conditions will exist. The proposition advanced by the Contractor does not sustain its contentions, and no warranty of weather conditions has been shown.

D.

*The alleged refusal of the State to suspend work on days of adverse weather.*

The contract incorporated by reference a printed volume entitled "General Requirements and Covenants", in which Subsection 8.8 (as printed) contained provisions for extension of the time fixed for performance of the contract, including extensions:

"(a) For delays caused by or suspension due to unsuitable weather. . . ." (p. 40)

By a special provision of the contract, the whole of Subsection 8.8 of the General Requirements and Covenants was deleted and the following was substituted:

"The Contractor shall complete all work within the time specified in the Proposal and the Special Provisions. No extension of time will be granted for the completion of the project and/or phases."

Notwithstanding the revision of Subsection 8.8, Subsection 8.9 of the General Requirements and Conditions continued to provide in relevant part as follows:

"*8.9 SUSPENSION OF WORK* — The Engineer may, by written order, suspend the performance of the work, either in whole or in part for such periods as he may deem necessary due to:

(a) Weather or soil conditions considered unsuitable for prosecution of the work, . . .

Any adjustment of contract time for suspension of work shall be made as provided in Subsection 8.8."

The Contractor sought to show that adverse weather conditions made productive work impossible or severely hampered operations on many days during the construction period and .that the State's engineer was requested to issue orders suspending work under Subsection 8.9 but refused to

do so in reliance upon revised Subsection 8.8. The trial court made no findings as to the number of days on which the engineer might have properly suspended the work for reasons of unsuitable weather, but concluded that the State had no obligation to suspend the work under Subsection 8.9. We agree. The case is not similar to those relied upon by the Contractor, in which suspension of work was held to have been improperly withheld. Cf. *Merritt-Chapman & Scott Corp. v. United States*, 439 F.2d 185 (Ct. Cl. 1971); *Urban Plumbing & Heating Co. v. United States*, 408 F.2d 382 (Ct. Cl. 1969); *cert. den.* 398 U.S. 958 (1969); *De Armas v. United States*, 70 F. Supp. 605 (Ct. Cl. 1947).

In these decisions suspension of work operated as an administrative finding upon which the contractor was entitled to relief from contract requirements under the provisions of the contract, and refusal of suspension orders adversely affected the contractor's rights under the contract. In the present case, the Contractor has not attempted to demonstrate that it was adversely affected by the State's refusal to suspend work in any respect other than as its obligation to complete the work on the date fixed by the contract might have been affected. But the Contractor has wholly failed to demonstrate how, within the terms of the contract, the issuance of an order suspending work would have postponed the completion date fixed by the contract. Subsection 8.8, as revised, stands squarely in the way.

Had the State's engineer issued orders suspending the work from time to time, such orders might have furnished some support for an argument that the Contractor was prevented from prosecuting the work during the periods covered by the suspensions and became entitled to corresponding relief from the fixed completion date. But we do not reach that question where, as here, the State has refused to suspend the work. We find nothing in Subsection 8.9 which strengthens the basic claim of the Contractor that it is entitled to relief from the effects of adverse weather conditions, with which claim we have already dealt.

We conclude that the trial court committed no error in adjudging that the Contractor is not entitled to recover

damages for delays in the work attributable to adverse weather conditions.

II

*The award to the State of liquidated damages.*

The contract provided for a completion date of July 25, 1968. The work was substantially completed on December 19, 1969. The contract provided for liquidated damages of $500 "for every working day's delay in finishing the work".[6] The trial court found that the number of working days (as defined in the contract) during the period between July 25, 1968 and December 19, 1969 was 343, which finding is not in question on this appeal. The trial court also found that 35 of these working days were required for the performance of the welding work dealt with in Part IV of this opinion and were not includible in the delay time for which the State is entitled to liquidated damages.[7] The sum of $154,000 (308 days times

---

[6] The contract provision is contained in the General Requirements and Covenants and reads:

    *8.11 FAILURE TO COMPLETE THE WORK ON TIME* — It is mutually agreed by and between the parties hereto that time shall be an essential part of this contract and that in case of the failure on the part of the Contractor to complete his contract within the time specified and agreed upon, the State of Hawaii will be damaged thereby; and the amount of said damages, inclusive of expenses for inspection, superintendence and necessary traveling expenses, being difficult if not impossible of definite ascertainment and proof, it is hereby agreed that the amount of such damages shall be the appropriate sum set forth below in the Schedule of Liquidated Damages as liquidated damages for every working day's delay in finishing the work in excess of the number of working days prescribed; and the Contractor hereby agrees that said sum shall be deducted from monies due the Contractor under the contract or if no money is due the Contractor, the Contractor hereby agrees to pay to the State of Hawaii as liquidated damages, and not by way of penalty, such total sum as shall be due for such delay, computed as aforesaid.

In the schedule referred to in the quoted paragraph, the amount of liquidated damages per working day is fixed at $500.

[7] The computation of "working days" for purposes of liquidated damages is governed by the contract definition. Compensation for extra expenses incurred during the extended period of 51 calendar days required to perform the welding work dealt with in Part IV did not involve this definition. This appears to be the explanation for the difference between the 35 days attributed to the welding work for liquidated damage purposes and the 51 days attributed thereto for compensation purposes. The discrepancy is not questioned by the parties.

$500) was awarded as liquidated damages. The Contractor's appeal raises with respect to the award the questions reviewed in Part I and in this part, but does not question the computation if those questions are resolved against the Contractor. The State's appeal contends that the 35 days attributed to welding work should not have been excluded in computing liquidated damages. But this contention is founded on the basic premise that this delay in the welding work was not attributable to the State. We reject this premise in Part IV, and the portion of the State's appeal related to the disallowance of liquidated damages for the 35 days attributed to welding work falls with it.

The Contractor advances the proposition that liquidated damages may not be assessed for late completion of the contract because timely performance was impossible at the outset or the delay was caused or contributed to by the State. The Contractor's argument does not direct our attention to any action of the State which caused or contributed to a delay in performance, other than the requirement of the welding work to which we have referred. The findings of the trial court give full effect to this action of the State, as a partial excuse for the delay in completion. Accordingly, we have for consideration only the Contractor's contention that timely performance of the contract was impossible when the contract was entered into. Such impossibility, it is argued, would relieve the Contractor from liability for delayed performance under the principle expressed in RESTATEMENT OF CONTRACTS, § 456 (1932): "[A] promise imposes no duty if performance of the promise is impossible because of facts existing when the promise is made of which the promisor neither knows or has reason to know."

The Contractor's argument here retraces much of the ground we have covered. Impossibility of timely performance is asserted by reason of the contract specifications which required that certain work be done only when the temperature was 40°F and rising, or 50°F and rising. Additionally, there was evidence that a professional estimator employed by the State had advised the State that it would take 15 months to complete the work, if no winter work were done, while the

contract required completion in 9½ months with no exception of winter work. Because of the weather data in the possession of the State when the contract was made, it is argued that the State knew, and the Contractor did not know or have reason to know, that weather conditions would make it impossible to complete the work in the time provided. The adequacy of the proof to support this contention has been fully reviewed in Part I. We there concluded that the Contractor failed to carry the burden of showing that the adverse weather conditions which were met during construction should have been forecast on the basis of the weather data in the State's possession. The Contractor falls even further short of showing that the predictability of such future weather conditions made them facts which rendered the timely completion of the contract impossible when it was entered into.

In the cases to which the Contractor looks for support, the contract specifications were so defective that work done in compliance with the specifications would not accomplish the performance of the contract. For example, *Grand Rapids Asphalt Paving Co. v. City of Wyoming,* 29 Mich. App. 474, 185 N.W. 2d 591 (1971), involved a paving contract which called for completion by November 15. The contract specifications prohibited the laying of pavement between November 1 and May 15, unless authorized by the engineer. The engineer refused permission to proceed during these winter months. The work was not completed until July 12 of the following year. It was found that excusable delays prevented completion of the contract before the prohibition of winter work became applicable, and that the contract was therefore impossible of performance when made, thus relieving the contractor from liability for liquidated damages. But it was the prohibition of winter work, rather than the rigors of winter weather, which was viewed by the court as creating impossibility, and the case gives no guidance in adjudging the effect of adverse weather conditions. No other decision to. which the contractor refers has any greater applicability here.

The circumstances under which this contract was entered into do not, on close inspection, furnish sufficient ground for relieving the Contractor from its undertaking as expressed in the contract. While prudent contractors may ordinarily require inclusion of a provision adjusting the performance date to reflect weather delays, the parties here were free to exclude such a provision from their contract and did so. The award of liquidated damages against the Contractor has not been shown to be erroneous under the propositions advanced by the Contractor. Since the inclusion of the award of liquidated damages in the judgment has not otherwise been called into question, it must be sustained.

III

*The award to the State of reimbursement of the settlement payment to the telescope contractor.*

The contract required the Contractor.to construct and complete the work in accordance with a schedule which divided the work into three phases. The second phase included completion of certain portions of the observatory building to enable commencement of the telescope installation. The Contractor was required to complete this work by March 31, 1968 and to provide sole occupancy of these portions of the building to the telescope contractor during the ensuing two months. Access to the building by the telescope contractor was not provided by the Contractor until some time in September, 1969. The telescope contractor presented to the State a claim for additional compensation, which was settled by the payment to the telescope contractor of $48,229 pursuant to a settlement agreement. The State counterclaimed for this amount, as an expense incurred by reason of the Contractor's breach of its contract.

Payment by the State of the claim of the telescope contractor was found by the trial court to have been reasonable in view of the additional expenses and costs it had incurred because of the Contractor's delay and the desirability of avoiding a long and costly lawsuit by the telescope contractor against the State. The judgment, in paragraph

2(b), awards to the State the sum of $48,229 in reimbursement of the settlement payment. The Contractor contends that its liability, if any, for the delay in completion of the second phase of the contract work was satisfied by the award of liquidated damages, and that the State was not entitled to also be awarded its actual damages.

The State does not dispute that "where the parties especially provide or stipulate for liquidated damages, such liquidated damages take the place of any actual damages suffered and that any recovery for breach is limited to the amount as agreed upon." *Trans World Airlines v. Travelers Indemnity Company,* 262 F.2d 321, 325 (8th Cir. 1959). However, the State contends that the contract provided for liquidated damages only for delay in finishing the entire work on the completion date specified, and that damages for failure to complete a phase of the work were not liquidated by the contract. This reading of the contract is consistent with the wording of the liquidated damage provision, which liquidates the damages suffered by the State "in case of the failure on the part of the Contractor *to complete his contract* within the time specified and agreed upon." (General Requirements and Covenants Sec. 8.11, emphasis supplied). The failure of the Contractor to complete the second phase of the work on the specified date was not a breach to which this provision is applicable unless "his contract" is interpreted as meaning any separable portion of the work as to which a completion time is specified. We have not been referred to any authority which would require us to give the contract language other than its natural and apparent meaning. We conclude that the State was not entitled to liquidated damages for the Contractor's failure to complete the second phase of the contract. The trial court computed the liquidated damages awarded in the judgment only for the delay in accomplishing substantial completion of the work, measured from the date specified for completion of the entire work. Accordingly, the award of liquidated damages neither should have nor did in fact compensate the State for the delay in the completion of the second phase of the work and the State is entitled to its actual damages.

The Contractor also attacks certain of the findings of fact upon which the award of reimbursement of the settlement payment was based, as not supported by substantial evidence. We have reviewed more than 400 pages of testimony which was heard by the trial court on the merits of the claim of the telescope contractor against the State and on the circumstances of the negotiation which led to the settlement agreement. There was substantial evidence in the record to support the findings which the Contractor challenges, they are not clearly erroneous and they cannot be set aside. *J. A. Thompson & Son, Inc. v. State, supra; Imperial Finance Corp. v. Finance Factors*, 53 Haw. 203, 490 P.2d 662 (1971).

The Contractor was on notice, from the express reference in its contract to the telescope contractor, that the State might be required by the telescope installation contract to provide timely access to the observatory building for the purposes of the telescope installation. The losses suffered by the State by reason of its inability to fulfill this obligation were the natural consequences of the Contractor's breach of its contract, which the Contractor had reason to foresee at the time of the making of the contract and are recoverable by the State from the Contractor. 5 CORBIN ON CONTRACTS, § 1013 (1964); *City of Bridgeport v. United States Fidelity & Guaranty Co.*, 105 Conn. 11, 134 A. 252 (1926). The Contractor challenges only the sufficiency of the evidence to support the trial court's findings of fact, and does not question on this appeal the sufficiency of those findings to support the trial court's ultimate conclusion that the loss suffered by the State by reason of the settlement payment was caused by the Contractor's breach. Since we have concluded that the challenge to the findings of fact has not been sustained, the award to the State of damages in reimbursement of this payment must be affirmed.

IV.

*The award to the Contractor of increased dome construction costs.*

The judgment awarded to the Contractor four items of damages totalling $162,987.12, related to increased dome construction costs:

(a) $32,797.09 for welding dome skin joints;

(b) $17,584.28 for deletion of Alternate No. 2;

(c) $60,432.75 for cost of welding dome structural connections;

(d) $52,173.00 for reimbursement of job site and other indirect expense for 51 calendar days required by Items (a), (b) and (c).

Although not segregated in the judgment, the amount awarded for job site and other indirect expense was based on findings which computed these costs for each item as follows:

(a) 18 calendar days at $1,023 per day, or $18,414;

(b) 15 calendar days at $1,023 per day, or $15,345;

(c) 18 calendar days at $1,023 per day, or $18,414.

On their respective appeals, the Contractor contends that the total award for increased dome construction costs should have been $478,975.28, and the State contends that no award should have been made. However, with respect to item (b), the award for deletion of Alternate No. 2, the State concedes that the Contractor is entitled to a judgment in this amount unless the claim should be denied for the reason considered in Part V. Since the factual basis for this item is not significant here, further mention of it will be omitted in this Part.

The contract specifications for the joining of the structural elements and of the skin panels of the observatory dome were the subject of much dispute between the Contractor and the State during construction. The trial court found that less expensive welds than those insisted upon by the State would have satisfied the specifications, and awarded to the Contractor additional compensation in the amount of its increased costs, as determined by the court. The Contractor asserts that it was entitled to a larger award, but does not include any question with respect to the inadequacy of the award in its statement of the questions

presented by its appeal and does not refer to the inadequacy of the award in its statement of the points on which it relies in its appeal. The only particulars in which the findings with respect to these costs are alleged by the Contractor to be erroneous are that they differed from the allegations of the claim presented by the Contractor to the State.

The Contractor contended below that the contract permitted it to utilize other optional methods of performance in erecting the dome, as well as the less expensive welds, and that the State's insistence on its interpretation of the specifications increased the Contractor's costs in a total amount of $478,975.28. Upon conflicting testimony, the trial court found that in these other respects the State's interpretation of the specifications was correct. The Contractor points to no error in these findings, other than the rejection by the trial court of the testimony offered by the Contractor as to the meaning of the specifications and the trial court's acceptance of the testimony offered by the State.

> [W]here the trial court, sitting without a jury, has made its factual determinations, its "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." H.R.C.P. Rule 52(a). It is for the trial court to determine whether and to what extent a witness is worthy of credit, and to give to his testimony the weight that it deserves. The court may accept or reject the testimony of a witness in whole or in part. *Shinn v. Edwin Yee, Ltd.*, 57 Haw. 215, 219, 553 P.2d 733, 737 (1976).

We have reviewed the testimony and conclude that there was substantial evidence in the record to support the findings which the Contractor challenges, they are not clearly erroneous and they cannot be set aside. *J. A. Thompson & Son v. State, supra*.

The State does not question the findings of the trial court with respect to the dome construction specifications, but attacks the findings with respect to the extra costs incurred by the Contractor in welding the joints in accordance with the

State's interpretation of the specifications and the jobsite and indirect costs resulting from the deletion of Alternate No. 2. The State contends that the cost data in the claim was inadmissible hearsay and that opinion testimony based on such data was equally inadmissible.

The evidence before the trial court in support of the Contractor's claim for these costs consisted of the claim submitted by the Contractor to the State, admitted in evidence over the State's objection as Exhibit 85,[8] and the testimony of an officer or employee of the Contractor, a Mr. Wilcox, who prepared the claim. There was also in evidence an analysis of the claim prepared by a consulting engineer employed by the State, whose conclusions as to the Contractor's costs were, the State contends, drawn solely from the data set forth in Exhibit 85. Mr. Wilcox was permitted to testify, over the State's objection, that the claim fairly represented the increased costs incurred by the Contractor attributable to the various items of its claim. No evidence, other than the testimony of Mr. Wilcox, was offered to substantiate the cost data contained in the claim.

We are faced, at this point, with the question whether the inadmissibility of the Contractor's evidence may be asserted in support of the State's contention that the findings of the trial court were not supported by competent evidence. The rule has been stated:

Where evidence was, despite objection, improperly admitted by the court below, and the decision appealed from is not reversed on this ground, the evidence improperly admitted will, for the purpose of the appellate review, ordinarily be treated as if it were not in the record.

---

[8] The status of Ex. 85 as evidence of the truth of the matters it contained was ambiguous during the trial. Its original admission appears to have been only to show what claim was served on the State and for the purpose of illustrating Mr. Wilcox' testimony. We have reviewed the record, and have concluded that Exhibit 85 was finally accepted in evidence by the trial court for the truth of the cost data it contained and over the objection of the State that such matters constituted inadmissible hearsay.

So, in connection with the rule that where the trial is to the court, the decision need not be reversed because of the improper reception of evidence, since it will be assumed that such evidence was not considered in reaching the decision, it has been said that in reviewing the decision the appellate court should ignore the presence in the record of such evidence. 5 Am. Jur. 2d, *Appeal and Error,* § 737 (1962).

We have indicated agreement. In *Tanaka v. Mitsunaga,* 43 Haw. 119, 127 (1959), and in *Lennen & Newell v. Clark Enterprises,* 51 Haw. 233, 238, 456 P.2d 231, 235 (1969), we quoted with approval: "An appellate court will not reverse a judgment in a nonjury case because of the admission of incompetent evidence, unless all of the competent evidence is insufficient to support the judgment or unless it affirmatively appears that the incompetent evidence induced the court to make an essential finding which would not otherwise have been made." *Builders Steel Co. v. Commissioner of Internal Revenue,* 179 F.2d 377, 379 (8th Cir. 1950). It is appropriate, therefore, for us to consider the competency of the evidence in the record which supports the court's findings, upon a challenge to the sufficiency of the evidence, but our inquiry is at an end if we discover any sufficient competent evidence upon which the findings may rest, notwithstanding that incompetent evidence is also in the record. The State's challenge to the direct evidence of the Contractor's costs, as contained in Exhibit 85, must be fruitless if the record contains competent opinion evidence in support of the findings.

Mr. Wilcox was presented as an expert witness and evidence of his qualifications to express an opinion as to costs incurred in construction was received. In large part, his testimony was in response to a general question which asked him to "go through the claim and explain the sections, what they comprise, what they represent, and, basically how they were prepared." His testimony demonstrated that he had no knowledge of the matter prior to May 1969, at which time he was executive vice president of one of the contracting firms

which made up the joint venture referred to here as the Contractor and was asked to visit the site of the work for the purpose of ascertaining whether there was any basis for a claim for extra compensation by the Contractor. The data with respect to the time spent in the performance of the welding work by men and equipment of the Contractor, and the daily jobsite costs incurred during the period of performance, were obtained from summaries of the Contractor's records provided by other officers and employees of the Contractor. Upon this foundation, Mr. Wilcox was asked for and gave his opinion that the amounts stated in the claim fairly represented the costs of the delays and other problems attributable to the method of welding required by the State. The State objected to this question only upon the ground that it called "for the answer that only this Court can give." The objection was overruled and the testimony was admitted.

The State has not presented any issue, on this appeal, with respect to the qualifications of Mr. Wilcox as an expert witness as to the Contractor's costs or with respect to the propriety of the receipt of expert opinion evidence on that subject, and must be taken as having waived the objection made below that opinion testimony was not admissible as to the Contractor's costs. The contention here is that the opinion testimony was inadmissible under the rule of *State v. Davis*, 53 Haw. 582, 499 P.2d 663 (1972), because based on facts and data which were not in evidence and which could come from this witness only as inadmissible hearsay.

*State v. Davis, supra,* dealt with an opinion of an expert witness which relied heavily upon the opinion of another expert who was not before the court, and is not in point here. We note that there is substantial authority for the receipt of expert opinion testimony, notwithstanding that it is based upon an investigation made by the witness for the purpose of the litigation and upon facts ascertained through hearsay. *Cf.* 3 WEINSTEIN'S EVIDENCE ¶ 703[02] (1976). It is said to be for the trial court to determine, in the exercise of its discretion, whether the expert's sources of information are sufficiently

reliable to warrant reception of the opinion. *Standard Oil Co. v. Moore*, 251 F.2d 188, 221 (9th Cir. 1958). But we need not proceed further with this question. The objection made by the State to the question calling for the opinion went only to the subject matter, and did not state any objection to the admission of hearsay evidence. The ground of objection which is now asserted was not raised and properly preserved in the trial court. Accordingly, it will not be considered on appeal and the opinion testimony in question will be considered to be competent evidence in the record. *Low v. Honolulu Rapid Transit*, 50 Haw. 582, 445 P.2d 372 (1968).

The findings of fact made by the trial court with respect to the amounts of the Contractor's extra costs are presumptively correct and the State bears the burden of pointing out specifically wherein they are erroneous. Upon a challenge to a finding for alleged insufficiency of the evidence, we will not search the record to discover what evidence supports the finding. The burden on the party seeking to overthrow a finding for insufficiency of the evidence includes the presentation of an analysis of the evidence which is sufficient to demonstrate its insufficiency. *Campbell v. DePonte*, 57 Haw. 510, 560 P.2d 1303, *rehearing den.* 57 Haw. 564, 560 P.2d 1303 (1977). The State made no effort to show that the opinion testimony of Mr. Wilcox, if properly admitted, did not support the conclusions embodied in the findings. It is apparent that the testimony of Mr. Wilcox would have supported findings of Contractor's costs in considerably larger amounts. We have no occasion, therefore, to attempt to match the amounts determined by the trial court with the data, calculations and conclusions contained in Exhibit 85 and incorporated in Mr. Wilcox's testimony. There being competent evidence in the record, and no showing to the contrary, it will be presumed that the trial court relied thereon in making his determinations. *Shinn v. Yee, supra.*

The State has failed to carry the burden of showing that the findings of the trial court in support of the judgment for the Contractor are clearly erroneous by reason of the insufficiency of the evidence.

V

*The defense of attempted fraud in the proof of the claim.*

The present action is brought pursuant to the consent of the State and the grant of jurisdiction contained in Chapter 661, HRS, and is subject to the provisions of HRS § 661-7:

> *Claim forfeited by fraud.* Any person who corruptly practices or attempts to practice any fraud against the State in the proof, statement, establishment, or allowance of any claim, or any part of any claim against the State, shall ipso facto forfeit the same to the State; and the court, in such cases, shall find specifically that fraud was practiced or attempted to be practiced, and thereupon give judgment that such claim is forfeited to the State, and that the claimant is forever barred from prosecuting the same.

This section is modelled upon the federal statute, 28 U.S.C. § 2514, which in similar language has the effect of withdrawing the consent of the United States to be sued upon any contract or transaction in connection with which the claimant has corruptly practiced or attempted to practice fraud. *Globe Indemnity Co. v. United States*, 84 Ct. Cl. 587 (1937).

A defense under HRS § 661-7 is an affirmative defense, which must be pleaded. Rule 8(c), H.R.C.P. The State sought to amend its answer to add this previously unpleaded defense by oral motion made after all the evidence in chief had been presented by both the Contractor and the State. It is apparent that counsel and the trial court understood the motion as made under Rule 15(b), H.R.C.P., which permits amendment of a pleading at any time to conform the answer to the evidence. However, by the express provisions of the rule, such an amendment may be made only when an issue not raised by the pleading has been tried by express or implied consent of the parties or when evidence is objected to at the trial upon the ground that it is not within the issues made by the pleadings. Where the issue has been tried by consent of the parties an amendment of the pleadings is unnecessary and merely formal, the same being treated as if it had been

raised in the pleadings whether or not the pleadings are amended. 6 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, Civil § 1493 (1971). On this appeal, the State argues that the evidence established a complete defense under HRS § 661-7 and that the judgment for the Contractor should be reversed notwithstanding denial of the State's motion to amend its answer. Since the issue was before the trial court, and consequently before us, only if it was tried by the express or implied consent of the parties, our first inquiry must be into that question.

The evidence upon which the State relies was presented in response to a "report" filed with the trial court by counsel for the State, in which it was charged that one of the attorneys for the Contractor, an attorney not admitted to practice in Hawaii but appearing in association with local counsel, had either participated in or had knowledge of the removal from Hawaii of the State's former inspector of this project, who was at the time a prospective witness for the State. A hearing was held by the trial court on the report, in which testimony was given with respect to the circumstances of the departure of the project inspector and in which an alleged conversation was described in which the attorney had been overheard saying that the inspector was the only person with first hand knowledge of what went on at the construction site and "we've shipped him out . . . we are not going to help them find him." Following this hearing, which did not result in any action by the trial court on the record, the attorney withdrew from the case and the Contractor was represented for the remainder of the trial by local counsel.

The project inspector was located by the State and returned to Hawaii to testify for the State. The State was awarded judgment for its expenses incurred in locating him, in the sum of $1,451.06. The trial court found, in support of this item of the judgment, that officers of the Contractor had obtained mainland employment for the inspector with the object of preventing him from testifying for the State, and had purchased airplane tickets for him and his wife. The State bases its defense under HRS § 661-7 upon this finding and the

related findings of the trial court, which were not challenged by the Contractor on its appeal.

The State's possible defense under HRS § 661-7 was not brought to the attention of the court or the Contractor until near the end of the trial and after the hearing on the report of the alleged misconduct of the Contractor's counsel. All of the evidence relevant to this issue came before the court during that hearing. Whatever issues were then being tried, we believe it is clear that the State's defense under HRS § 661-7 was not one of them. This issue having never been tried by express or implied consent of the parties, Rule 15(b) furnished no support for the State's motion to amend its answer and the issue was not before the trial court. The validity of the defense which the State seeks to assert under HRS § 661-7 is not directly before us on this appeal.

However, the fact that the State was not entitled to amend its answer to conform to the evidence does not dispose of its motion, if the amendment of its answer should have been allowed under Rule 15(a), H.R.C.P., which permits a party to amend its pleading by leave of court and requires that leave shall be freely given when justice so requires. Here the question is whether an issue not yet tried should be permitted to be raised at the end of a lengthy trial. We have said that the grant or denial of leave to amend under Rule 15(a) is within the discretion of the trial court. *Bishop Trust Co., Ltd. v. Kamokila Development Corp.*, 57 Haw. 330, 555 P.2d 1193 (1976). In the cited case we sustained the denial of a motion to amend an answer to plead affirmative defenses, where it appeared that there had been undue delay which had prejudiced the plaintiff, and we referred to the following statement of the general standard employed under Rule 15(a) by the federal courts:

> In the absence of any apparent or declared reason — such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. — the leave sought should, as

the rules requires, be "freely given." (*Foman v. Davis*, 371 U.S. 178, at 182).

The motion in the present case should be judged by this standard. The fact that the motion was made after the evidence in chief of both parties had been presented weighs against the motion. However, the alleged defense was predicated on conduct of the Contractor during the course of the trial and the evidence had already been developed, although on another issue. None of the usual reasons for denial of a motion to amend were present except the possible futility of the amendment.

How far the trial court ordinarily should inquire into the substantive merits of a claim or defense on a motion to amend under Rule 15(a) is open to debate. 6 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, Civil § 1487 (1971). However, the circumstances in which the motion was presented in the present case made it apparent that the real issue before the court was the sufficiency of the evidence upon which the State proposed to rely. The remarks of the trial judge at the hearing on the motion to amend indicated that the motion was denied upon his opinion that the evidence presented at the hearing on the misconduct report was insufficient to sustain an allegation of fraud or attempt to practice fraud in the proof of the claim and that the amendment would be futile. We conclude that we should consider as before us on this appeal the question whether such evidence, if presented in a trial of the issue and viewed in the light most favorable to the State, would prima facie establish the defense. This question has been briefed and argued, in substance, on this appeal.

The terms used in HRS § 661-7 are not defined in the statute. Neither are they defined with specificity in our decisions. We have quoted the following in a case where the issue was the commission of constructive fraud:

> Fraud in its generic sense, especially as the word is used in courts of equity, comprises all acts, omissions and concealments involving a breach of legal or equitable duty and resulting in damage to another. Fraud has also

been defined as any cunning or artifice used to cheat or deceive another. However, the wisdom of an exact legal definition of fraud has been questioned, and it has been stated that fraud is better left undefined, and some courts have said that the common law not only fails to define fraud but perhaps asserts as a principle that there shall be no definition. Further it is frequently stated that owing to the multiform character of fraud and the great variety of attendant circumstances no definition which is all inclusive can be framed, but each case must be determined on its particular facts. (26 C.J., § 1, p. 1059, as quoted in *Daly v. Showers* [Appellate Court of Indiana, En Banc., May 4, 1937] 104 Ind. App. 480, 8 N.E. [2d] 139, 142.)

(*Von Holt v. Izumo Taisha Kyo Mission,* 42 Haw. 671, at 722)

To establish its defense, the State must show that the acts of the Contractor in inducing the project inspector to leave Hawaii with the purpose of making his testimony unavailable to the State constituted an attempt corruptly to practice fraud in the proof of the claim, within the meaning of HRS § 661-7. There can be no question that such conduct on the part of the Contractor, if established, would have taken place "in the proof, statement, establishment or allowance" of the claim, since it would have been in the context of a trial conducted for the purpose of proving the claim. Whether such conduct should be characterized as an attempt to practice fraud can best be considered in the light of the doctrine under which equitable relief is granted against a judgment obtained by fraud. The rule has been stated:

A United States court sitting in equity may vacate and set aside a judgment for fraud which was extrinsic or collateral to the matter tried but not for fraud which was in issue in the former suit. *United States v. Throckmorton,* 98 U.S. 61, 25 L.Ed. 93. The line of distinction between the two is sometimes indistinct and difficult to draw; dialectic niceties have sometimes been used in an effort to blueprint it; and tenuous differences have occasionally

been sketched. Broadly stated, fraud practiced by a successful litigant which prevents his unsuccessful adversary from fully exhibiting his case, such as wrongfully preventing him or his material witnesses from attending the trial, inducing his attorney to professional delinquency or infidelity in connection with the case, or some other similar act, unmixed with fault or negligence on the part of the losing party, constitutes extrinsic or collateral fraud; and the introduction of perjured testimony or forged documents, or other cognate matter, which is actually considered in the judgment constitutes intrinsic fraud. (*Brady v. Beams*, 132 F.2d 985 at 986-987 (10th Cir. 1943)).

Similarly, in *Godfrey v. Godfrey*, 86 P.2d 357, 362 (Cal. App. 1939), extrinsic fraud is said to include "acts preventing the presence at trial of material witnesses". To the same effect is *Britton v. Gannon*, 285 P.2d 407 (Okla. 1955) and Annot.: Secreting witness or other conduct preventing summoning or appearance of witness as ground for relief from judgment, 131 A.L.R. 1519 (1941). Of course, the question whether the conduct under examination here constituted extrinsic or intrinsic fraud would be material only to the State's right to relief from the judgment in a proceeding brought for that purpose. The State need not establish that the fraud was extrinsic to establish its defense under HRS § 661-7. Thus intrinsic fraud, consisting of alteration of books of account which had the effect of presenting perjured testimony, has been held to require forfeiture of the claim under 28 U.S.C. § 2514, the federal statute upon which HRS § 661-7 is modeled. *Blume v. United States*, 81 Ct. Cl. 210 (1934), *cert. den.* 297 U.S. 722, *rehearing den.* 298 U.S. 691. The secreting of a witness was regarded as equivalent to the giving of perjured testimony, and as intrinsic fraud, in *Stephens v. Lampron*, 308 Mass. 50, 30 N.E.2d 838 (1941).

The State urges that the record shows a violation by the Contractor of HRS § 661-7, and that we should hold that the trial court erred in refusing to declare a forfeiture of the Contractor's claims, thus obviating the need for a remand of

this case for further proceedings. Even if we were to leave aside the procedural considerations to which we have referred, this course would not be open to us. The defense of fraud under the statute must be supported by clear and convincing evidence. *Law v. United States*, 195 Ct. Cl. 370, 440 (1971). Questions of credibility and the weight of the evidence are necessarily vital considerations in the ultimate determination of the effect of HRS § 661-7 upon the Contractor's claims. The findings of fact touching upon this issue are not sufficiently definitive to enable us to determine whether the applicable standard of proof has been met. The trial judge who heard this case has retired. Accordingly, a further trial of this issue is required.

We do no more here than to conclude that the motion of the State to amend its answer was accompanied by a showing that sufficient evidence was available to prima facie establish the defense and that denial of the motion in the circumstances of the case constituted an abuse of judicial discretion. The judgment in favor of the Contractor must be reversed to permit this defense to be raised by the State. Upon remand of the case, the State's motion to amend its answer should be granted.

VI

*The State's application for reimbursement of deposition expenses.*

The State served on the Contractor, pursuant to Rule 36(a), H.R.C.P., a request to admit that the Contractor's employees Kimberly Berg and Glenn Stevens met with Richard Tillson in June or July, 1967, and discussed weather and climate conditions on Mauna Kea with Mr. Tillson, and to admit specific matters of fact relating to the subjects discussed in the alleged meeting. The answer of the Contractor to each of the requests was "denied", without qualification. Subsequently, the State took the deposition of Kimberly Berg, who testified that he had met with Tillson within the period mentioned but that he did not recall whether any of the matters specified in the State's request to admit

had been discussed. The State applied, pursuant to Rule 37(c), for an order requiring the Contractor to pay the expenses of Kimberly Berg's deposition, and appeals from the denial of that application.

As Rule 37(c) read at the time the request to admit was served and responded to, reimbursement of expenses was provided in cases where the party served with the request responded with "a sworn denial". As amended effective July 1, 1972, Rule 37(c) provides for reimbursement if the party "fails to admit". The response of the Contractor meets both tests, and the difference in the language of the two versions of the rule is not material. Under both versions, reimbursement of expenses is conditioned on proof of the matter not admitted, and may be denied where the court finds that the admission sought was of no substantial importance.

The trial court found, with respect to the meeting between Berg and Tillson: "The Court finds it highly improbable that Tillson did not advise Berg about winter weather conditions at that meeting." However, the State did not call Tillson to testify with respect to the meeting and the record contains no evidence of what was discussed other than Berg's deposition. The State failed to prove any of the matters covered by the request to admit, other than that a meeting between Berg and Tillson, not including Glenn Stevens, had taken place.

The State contends that the Contractor was obliged, by Rule 36(a), to qualify its denial and to specify that part of what it was requested to admit was true, being the meeting of Berg and Tillson. Although denial by the trial court of the State's application for reimbursement was founded on the State's failure of proof, without recognition that there had been partial proof of the matters covered by the request to admit, so far as there was proof it related to a matter of no substantial importance. Reimbursement to the State of its expenses of the deposition was properly denied by the trial court.

The judgment in favor of the State is affirmed. The judgment in favor of the Contractor is reversed. The case is remanded to the trial court for further proceedings consistent with this opinion.

*Jack C. Morse,* Special Deputy Attorney General, for Defendant-Appellant, Cross-Appellee.

*Dennis E. W. O'Connor and Richard K. Quinn (Anthony, Hoddick, Reinwald & O'Connor* of counsel) for Plaintiffs-Appellees, Cross-Appellants.